Winifred M. JACOBS, Executrix of the Estate of Gerald Jon Jacobs, Deceased,

v.

LAKEWOOD AIRCRAFT SERVICE, INC., Beryl D'Shannon Aviation Specialties, Inc. and Flight Extenders, Inc.

Winifred M. JACOBS, Executrix of the Estate of Gerald Jon Jacobs, Deceased,

v.

FLIGHT EXTENDERS, INC.

v.

LAKEWOOD AIRCRAFT SERVICE, INC.

Civ. A. Nos. 79–1044, 80–0158.

United States District Court, E. D. Pennsylvania.

April 3, 1981.

David S. Shrager, Philadelphia, Pa., for plaintiff.

Dean F. Murtagh, Philadelphia, Pa., for defendant Flight Extenders.

## OPINION

LORD, Chief Judge.

### I. Preliminary Statement

In this products liability case, defendant Flight Extenders, Inc., a California corporation ("the California Corporation"), seeks summary judgment. Its motion implicates two developing theories: the liability of a successor corporation for torts committed by its predecessor corporation, see *Woody v. Combustion Engineering, Inc.*, 463 F.Supp. 817, 820 (E.D.Tenn.1978); and the liability of a successor corporation for breach of its duty to warn of recently discovered defects in its predecessor's products, see *Wilson v. Fare Well Corp.*, 140 N.J.Super. 476, 492–93, 356 A.2d 458, 467–68 (L.Div.1976). For the reasons that follow, I shall grant this motion.

### II. Facts

Plaintiff's decedent was killed on March 24, 1978 when his Bonanza airplane crashed in Pennsylvania. Plaintiff alleges that this crash was caused by, *inter alia*, a defective wing tip tank fuel system which had been designed, manufactured, and sold by Flight Extenders, Inc., a Connecticut corporation ("the Connecticut corporation").

Plaintiff did not sue the Connecticut corporation because it ceased operations in 1966. Rather, plaintiff sued the California corporation which had purchased some of the Connecticut corporation's assets. Although these two corporations were separate companies which existed at different times, plaintiff contends that the transferee corporation is liable for the injuries caused by defective products manufactured by its transferor. Resolution of this issue depends upon the nature of the contacts between the two corporations. I must therefore detail their respective corporate histories.

The Connecticut corporation was incorporated in 1960 in Stamford, Connecticut. Ronald Bamber was its president and primary stockholder; the other stockholders were his wife and two sisters-in-law. Bamber maintained the only corporate office in Stamford. This corporation manufactured and sold tip tank systems for use on various models of the Beechcraft Bonanza airplane. It also manufactured and sold a hot lunch kit called "Flight Maid" for installation in Bonanza airplanes. There were two or three employees throughout the company's lifetime.

The Connecticut corporation ceased all operations in April of 1966. All of its physical assets remained in Stamford. There were no outstanding liabilities or debts, and there were no accounts receivable. Nor were there any outstanding unfilled orders from purchasers.

In July, 1968, Bamber sold some of the dormant corporation's assets to one Robert Matheson. These assets included, *inter alia*, tools, molds, design drawings, parts, raw materials, placards, manuals, and other documents relating to the fifteen gallon tip tank system. Bamber also sold the use of the name "Flight Extenders," along with the good will attached thereto. Matheson did not receive any customer lists nor did he buy any assets relating to the hot lunch kit. Bamber agreed not to initiate any business involving the manufacture of tip tank systems for Bonanza airplanes. However, Bamber was not obligated to change the name of his corporation or to dissolve it. Bamber had no further involvement with his corporation after the sale; ultimately he discarded all his stock. The Connecticut corporation never resumed operations after this sale to Matheson.

Matheson paid $18,000 for these assets. This was a reasonable consideration. Matheson received no stock in the Connecticut corporation; nor did Bamber receive stock in any Matheson corporation.

When Matheson came to pick up these assets, Bamber briefly gave instructions on

constructing the tip tank system. This was the last contact that Bamber had with Matheson: Bamber was not offered any position in Matheson's corporation; Bamber did not provide any consulting services; and none of Bamber's employees became Matheson's employees. Indeed, Bamber has not seen or heard from Matheson since the day the assets were shipped.

Matheson then formed Flight Extenders, Inc., a California corporation (the defendant here), in August or September of 1968. On September 16, 1968, he sold the assets that he had bought from Bamber to this newly formed corporation in exchange for 200 shares of its common stock. None of the officers, directors, or shareholders of the Connecticut corporation became officers, directors, or shareholders of the California corporation.

The California corporation could not start manufacturing and selling operations immediately, however. In order to set up a manufacturing facility, Matheson had to get necessary tools, machines, and equipment, including, *inter alia*, a compressor, a booth for spraying, a heater, and other spraying devices. He also had to redraft the blueprints which he received from the Connecticut corporation since they were illegible and wrinkled. Moreover, he developed a new operating procedures manual and he revised Bamber's tip tank installation instructions. In addition, he had to buy the necessary raw materials because, although the Connecticut corporation had some remaining, they were too old and heavy and therefore Matheson had not shipped them from Connecticut to California. Matheson also had to buy fuel selector valves since Bamber did not have any on hand when Matheson came to pick up the assets. Consequently this was a "slow time" because of the need to set up the necessary manufacturing facilities and processes.

The California corporation also needed to get product manufacturing authority from the Federal Aviation Authority so that it could manufacture and sell the tip tank system. The company ultimately received this authority and began manufacturing and selling the systems. These tip tank systems were slightly different from the ones that the Connecticut corporation had manufactured and sold.

The California corporation sold only five to ten of these systems before it ceased operations and warehoused all its physical assets in January, 1970. The California corporation remained dormant until May, 1972 when its corporate shell was reactivated as the mail hauling company that it is today. It sold all its assets used in connection with the manufacture and sale of the tip tank system in May, 1973.

The tip tank system which was part of the airplane involved in this case was not designed, manufactured, sold, assembled, installed, or serviced by the California corporation. Moreover, the California corporation did not know of the owners of this particular tip tank system.

### III. Discussion

#### A. Corporate successor liability

##### 1. Introduction

Ordinarily when one company sells or transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor simply by virtue of its succession to the transferor's property. In order to find that this general rule is not applicable and that the transferee does acquire such liability, one of the following must be shown: (1) the purchaser expressly or impliedly agrees to assume such obligation; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is fraudulently entered into to escape liability. *Husak v. Berkel, Inc.*, 234 Pa.Super. 452, 456–57, 341 A.2d 174, 176 (1975). *See Knapp v. North American Rockwell Corp.*, 506 F.2d 361 (3d Cir. 1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975); *Cabrera v. Hayes-Albion Corp.*, C.A. No. 80–3108 (E.D.Pa. Feb. 10, 1981); *Woody v. Combustion Engineering, Inc., supra*

(Pennsylvania law); *Bippus v. Norton Co.*, 437 F.Supp. 104 (E.D.Pa.1977); *Shane v. Hobam, Inc.*, 332 F.Supp. 526 (E.D.Pa.1971); *Granthum v. Textile Machine Works*, 230 Pa.Super. 199, 326 A.2d 449 (1974). Plaintiff concedes that the first and fourth exceptions are inapplicable. But he contends that the transaction here falls under the second or third exceptions.

### 2. Merger

■ Traditionally the merger exception applies when the seller corporation is absorbed into the purchaser corporation, thereby losing its existence as a separate corporate entity. *See, e. g., Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 439 (7th Cir. 1977); *Knapp v. North American Rockwell Corp.*, 506 F.2d at 365; *Woody, supra; Shannon v. Samuel Langston Co.*, 379 F.Supp. 797, 801 (W.D.Mich.1974). That did not happen when Matheson bought some of the assets of the Connecticut corporation because the latter company continued to exist, there was not continuity of ownership in the successor corporation that was later formed, and the Connecticut corporation received fair consideration for its assets in a bona fide sale. *See, e. g., Woody, supra; Bazan v. Kux Machine Co.*, 358 F.Supp. 1250 (E.D.Wis.1973); *McKee v. Harris-Seybold Co.*, 109 N.J.Super. 555, 264 A.2d 98 (L.Div.1970), *aff'd per curiam*, 118 N.J.Super. 480, 288 A.2d 585 (App.Div.1972).

However, plaintiff argues that if I look to the substance of this transaction I will find the elements of a *de facto* merger because the Connecticut corporation's sale of its assets resembled a merger although the transaction lacked the formal characteristics of one. Plaintiff is apparently correct in noting that Pennsylvania courts "follow the philosophy ... that questions of an injured party's right to seek recovery are to be resolved by an analysis of public policy considerations rather than by a mere procrustean application of formalities ...." *Knapp v. North American Rockwell Corp.*, 506 F.2d at 369. *See Atlas Tool Co. v.*

*Commissioner*, 614 F.2d 860, 870 (3d Cir. 1980) (New Jersey law). *But cf. Woody v. Combustion Engineering, Inc.*, 463 F.Supp. at 821 ("The precedential force of *Knapp* is not free from doubt."). Nevertheless, the operative facts and consequences of the transaction here do not fit within this more liberal test.[1]

In *Knapp*, the predecessor corporation exchanged substantially all its assets for stock in the successor corporation. The predecessor retained cash sufficient to cover its expenses in connection with the transfer. The contract provided that on the closing date the predecessor would change its name and distribute the successor's stock to its shareholders. The predecessor further agreed to dissolve as soon as practicable. It so dissolved eighteen months later. However, the agreement prohibited the predecessor from engaging in normal business transactions during the interim period.

The *Knapp* arrangement resembled a sale, especially because the predecessor remained a separate corporate entity for some time after the transaction. *Knapp v. North American Rockwell Corp.*, 506 F.2d at 367. Nevertheless, the continued existence of the predecessor was "insubstantial[ ]" because of "the brevity of the [predecessor's] continued life, the contractual requirement that [the predecessor] be dissolved as soon as possible, the prohibition on engaging in normal business transactions, and the character of the assets [the predecessor] controlled." *Id.* at 367. Moreover, it was significant that the successor

acquired all the assets of [the predecessor] exclusive of certain real estate that [the successor] did not want, and assumed practically all of [the predecessor's] liabilities. Further, [the successor] required that [the predecessor] use its "best efforts," prior to the consummation of the transaction, to preserve [the predecessor's] business organization intact for [the successor], to make available to [the successor the predecessor's] existing officers

---

1. Thus I need not decide whether Pennsylvania courts would adopt the reasoning and holding of *Knapp*.

and employees, and to maintain [the predecessor's] relationship with its customers and suppliers. After the exchange, [the successor] continued [the predecessor's] former business operations. *Id.* at 369. Judge Adams therefore treated the sale of assets as a *de facto* merger and held the successor liable for injuries caused by defects in products manufactured by its predecessor.

The case at hand is distinguishable. The Connecticut corporation was under no obligation to dissolve at a certain time—the "most significant" consideration for a finding of *de facto* merger. *Id.* at 369. Moreover, it was not prohibited from transacting business; it received a fair cash consideration for its assets; it retained some of its assets; it was not required to, nor did it, maintain its business organization for Matheson; and it was not required to, nor did it, make available its existing officers or employees. Furthermore, the California corporation did not continue the Connecticut's business operations since the Connecticut corporation had not manufactured, sold, or serviced tip tanks for more than two years before the sale.

Most significantly, in *Knapp* the predecessor corporation exchanged assets for stock in the successor corporation. *Id.* at 363. This factor alone is dispositive under the *Knapp* test since in order to find a *de facto* merger, "the consideration given by the purchaser corporation [must] be shares of its own stock." *Leannais v. Cincinnati, Inc.*, 565 F.2d at 439, *citing Bazan v. Kux Machine Co.,* supra and *McKee v. Harris-Seybold Co.,* supra. "Absent a transfer of stock, the nature and consequences of a transaction are not those of a merger,"

*Travis v. Harris Corp.,* 565 F.2d 443, 447 (7th Cir. 1977), because there is no continuity of shareholder interest. Hence, "the two corporations are strangers, both before and after the sale." *Id.* Continuity and identity of shareholders are therefore necessary ingredients under the *Knapp* test. *Atlas Tool Co. v. Commissioner,* 614 F.2d at 871; *Leannais v. Cincinnati, Inc.,* 565 F.2d at 440 n.5 (distinguishing *Knapp* on precisely this ground); *Woody v. Combustion Engineering, Inc.,* 463 F.Supp. at 822; *Menacho v. Adamson United Co.,* 420 F.Supp. 128, 137 (D.N.J.1976). *See also Fehl v. S. W. C. Corp.,* 433 F.Supp. 939, 947 (D.Del.1977) ("In general, no liability has been found under a de facto merger theory as long as the transfer was in the ordinary course of business and the seller received and held consideration.") (citation omitted); *Lopata v. Bemis Co.,* 383 F.Supp. 342, 345 (E.D.Pa. 1974), *vacated and remanded,* 517 F.2d 1398 (3d Cir.), *judgment reinstated,* 406 F.Supp. 521 (E.D.Pa.1975); *Shannon v. Samuel Langston Co.,* 379 F.Supp. at 801.

There was no continuity or identity of shareholders here. Thus the transaction between the Connecticut corporation and Matheson did not in substance resemble a merger. I therefore hold that there was no *de facto* merger.[2]

### 3. Continuity

The primary elements of "continuation" include the common identity of the officers, directors, or stockholders in the predecessor and successor corporations, and the existence of only one corporation at the completion of the transfer. *Travis v. Harris Corp.,* 575 F.2d at 447; *Leannais v.*

---

**2.** Plaintiff ignores a further hurdle. He attempts to impose liability on a successor corporation. However, the Connecticut corporation did not transact any business with the California corporation since at the time of the sale of the assets, there was no California corporation. In light of my holding, *supra,* I need not decide whether this further undermines plaintiff's argument. I note, however, that at the time of sale, it was foreseeable that Matheson would set up a company to manufacture and sell tip tank systems. Therefore the fact that a corporation did not exist at the time of sale, but was

set up shortly afterwards, probably should not preclude an otherwise successful attempt to impose successor liability. *See Korzetz v. Amsted Industries, Inc.,* 472 F.Supp. 136, 144–45 (E.D.Mich.1979) (legally insignificant that predecessor was twice-removed from "successor"); *Ramirez v. Amsted Industries, Inc.,* 171 N.J.Super. 261, 408 A.2d 818 (App.Div.1979), *cert. granted,* 82 N.J. 298, 412 A.2d 804 (1980); *see also Knapp v. North American Rockwell Corp.,* 506 F.2d at 369 (admonition that such questions should not be resolved by resort to formalities).

*Cincinnati, Inc., id.* at 440; *Lopata v. Bemis Co., supra; Kloberdanz v. Joy Manufacturing Co.,* 288 F.Supp. 817, 821 (D.Colo.1968); *Wilson v. Fare Well Corp.,* 140 N.J.Super. at 485–86, 356 A.2d at 464 (citations omitted). In the present case, there was no such identity. Plaintiff has therefore failed to satisfy the traditional test for "continuation."

Plaintiff relies upon *Cyr v. B. Offen & Co.,* 501 F.2d 1145 (1st Cir. 1974) (New Hampshire law). In *Cyr,* key employees and an outside financier purchased the predecessor corporation shortly after its owner died. The same employees continued without pause to produce the same products in the same plant, with the same supervision in the same way. Moreover, the purchasers assumed the old service obligations without notifying the previous customers that a new business was beginning. Indeed, the new corporation advertised itself as an ongoing enterprise, and even claimed that it was a forty-year old business. "[F]acial and substantive continuity were the essence of the bargain." *Id.* at 1152. The court therefore held that the successor was not immune from liability. *Cyr* is inapposite because here the California corporation had a different plant, different employees, different supervisors, and different customers. Nor did the California corporation hold itself out as the same enterprise.

*Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976) is likewise distinguishable. In *Turner,* the predecessor and successor were not " 'corporate strangers.' " *Id.* at 425, 244 N.W.2d at 881. On the contrary, the successor deliberately maintained the same product, personnel, policy, properties, operations, and clients in order "to incorporate [the predecessor] into its system with as much the same structure and operation as possible. Continuity [was] the purpose, continuity [was] the watch

word, continuity [was] the fact." *Id.* at 426, 244 N.W.2d at 882. In the present case, however, such continuity was not "the consideration for the whole deal," *id.* at 429, 244 N.W.2d at 883, since the California corporation only bought some assets from an inactive corporation,[3] and then moved them across the country in order to start a company in a different physical location with different employees, a different policy, and different management. In short, the California corporation was a different "operation." *See also Andrews v. John E. Smith's Sons Co.,* 369 So.2d 781, 785 (Ala.1979) ("basic continuity" between predecessor and successor because, *inter alia,* the same products were manufactured by the same employees in the same place; moreover the successor held itself out as the predecessor —"an old established company"—in dealings with its customers).

I hold that the California corporation was not a continuation of the Connecticut corporation. Therefore, none of the four traditional exceptions to the general rule of the non-liability of a successor corporation applies in this case.

### 4. Product Line

■ Plaintiff asserts that the policies underlying strict tort liability for defective products compel a fifth exception to the general rule. *See Ray v. Alad Corp.,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977); *Ramirez v. Amsted Industries, Inc., supra. Contra, Rhynes v. Branick Manufacturing Corp.,* 629 F.2d 409 (5th Cir. 1980) (Texas law); *Travis v. Harris Corp., supra* (Ohio and Indiana law); *Leannais v. Cincinnati, Inc., supra* (Wisconsin law); *Freeman v. White Way Sign & Maintenance Co.,* 82 Ill.App.3d 884, 403 N.E.2d 495 (1980). I will assume *arguendo* that this extension of the law of successor liability governs this action.[4] Nevertheless, I conclude that under

3. *See* note 2 *supra.*

4. The California corporation was incorporated, and has its principal place of business, in California. Plaintiff therefore argues that California "arguably" has the most significant interest in the resolution of whether a California corpo-

ration should be held strictly liable for injuries caused by a defective product manufactured by its predecessor. I need not decide here whether governmental interest analysis, *see Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964), requires that California law be applied to the facts at hand since I assume *ar-*

the circumstances presented here, the California corporation is not liable under the product line test.

*Ray* held that the policies underlying strict tort liability compel a special exception to the traditional rules of corporate successor liability.

> Justification for imposing strict liability upon a *successor* to a manufacturer under the circumstances here presented rests upon (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

19 Cal.3d at 31, 136 Cal.Rptr. at 579–80, 560 P.2d at 8–9 (emphasis in original). But *Ray* did not establish a *per se* rule. Rather, these three rationales must be considered in the particular circumstances of each case. *See id.* at 31 & 34, 136 Cal.Rptr. at 580 & 582, 560 P.2d at 9 & 11. The *Ray* court did conclude on the facts before it that it was appropriate to hold the successor strictly liable for defects in products manufactured and distributed by its predecessor. The circumstances here, however, are distinguishable.

In *Ray,* the plaintiff faced "insuperable obstacles," *id.* at 32, 136 Cal.Rptr. at 580, 560 P.2d at 9, in recovering a judgment

from the predecessor corporation. In this case, plaintiff likewise would face formidable barriers if he attempted to obtain satisfaction of a judgment against the Connecticut corporation since it was dissolved more than ten years ago. Thus, the first justification for the special exception applies in the present case.[5]

In considering the second justification, *Ray* looked to the transaction by which the predecessor transferred its assets to the successor: "the transaction by which [the successor] acquired the [predecessor's] name and operating assets had the further effect of transferring to [the successor] the resources that had previously been available to [the predecessor] for meeting its responsibilities to persons injured by defects in [products] it had produced." *Id.* at 33, 136 Cal.Rptr. at 581, 560 P.2d at 10. These resources included the same physical plant, manufacturing equipment, inventories of raw materials, work in progress, finished goods, manufacturing designs, factory personnel, general manager, sales representatives, and customers. *Id.* at 24–25 & 33, 136 Cal.Rptr. at 576 & 581, 560 P.2d at 5 & 10. Moreover, there was no outward indication of any change in the ownership of the business. *Id.* at 25, 136 Cal.Rptr. at 576, 560 P.2d at 5. By contrast, the California corporation's "resources" were quite different from the Connecticut corporation's: there was a different plant, manufacturing equipment, inventories, personnel, management, and sales representatives; furthermore, when Matheson came to Stamford to pick up the Connecticut corporation's assets, there was no work in progress, finished

---

guendo that Pennsylvania courts would adopt this new rule of successor liability if given the opportunity. *See Gee v. Tenneco Inc.,* 615 F.2d 857, 861 (9th Cir. 1980) (assuming *arguendo* the applicability of the more liberal substantive law). If California and Pennsylvania law are the same, there is no conflict and I therefore need not choose which state law applies. *But cf. Lopata v. Bemis, supra* (holding New Jersey had the greatest interest in the litigation since it was the situs of the defective machine, plaintiff's injury, and plaintiff's employer; and it was plaintiff's temporary residence); *see also Litarowich v. Wiederkehr,* 170 N.J.Super. 144, 405 A.2d 874 (L.Div.1979).

**5.** The California corporation asserts that there is another available defendant. "The record is clear," it argues, that the Atlantic Aviation Service, Inc., which sold and installed the actual tip tank system, is a defendant in a state action brought by plaintiff. However, the California corporation's motion for summary judgment does not present any records or pleadings from this state action. I therefore cannot accept the California corporation's unsubstantiated assertion in its brief. *See* Fed.R.Civ.P. 56(e).

goods, or raw materials to take back with him. Thus the acquisition in the present case [6] did not give the California corporation "the opportunity formerly enjoyed," *id.* at 33, 136 Cal.Rptr. at 581, 560 P.2d at 10, by the Connecticut corporation to pass on to *its* customers the costs of meeting the risks of manufacturing defects. *Cf. Cyr v. B. Offen & Co.*, 501 F.2d at 1154. ("If as a group the same employees continue, without pause[,] to produce the same products in the same plant, with the same supervision, the ownership of the entity which maintains essentially the same name cannot be the sole controlling determinant of liability."). Therefore the second justification for the product line exception does not apply in the instant case.

The *Ray* court next considered the fairness of imposing successor liability in light of the circumstances of the acquisition. The court concluded that it was indeed fair and equitable to impose such liability because in that case the successor acquired its predecessor's trade name, good will, customer lists, and its continuing ability to produce the same product. 19 Cal.3d at 34, 136 Cal.Rptr. at 581, 560 P.2d at 10. Moreover, it held itself out to potential customers as the same enterprise, *id.*; for instance, its sales representatives were not instructed to notify customers of the change in ownership. *Id.* at 28, 136 Cal.Rptr. at 577–78, 560 P.2d at 6–7.

In the present case, the California corporation did acquire its "predecessor's" trade name and good will. However, it did not receive customer lists; nor did it have the same ability to produce the same product. Furthermore, it did not hold itself out to potential customers as the same enterprise. On the contrary, trade journals publicized that there had been a change in the company that manufactured the tip tank systems for Bonanza aircraft. Deposition of Robert B. Matheson at 29.

Plaintiff refers to Matheson's deposition and argues that "[n]othing was done to indicate to past or future customers that the [California] corporation was anything

more than a continuation of the original manufacturing enterprise." Plaintiff's Memorandum in Opposition to Defendant Flight Extenders, Inc.'s Motion for Summary Judgment at 9. Yet the deposition belies this conclusory statement. Matheson did state that the California corporation held itself out as building the same *product* that had been built in Connecticut. Deposition of Robert B. Matheson at 29. However, there is no evidence that the California corporation held itself out as being the same manufacturing *entity* as the Connecticut corporation. But this latter type of holding out—as the same entity—is the relevant factor in the product line test. *See Ray v. Alad Corp.*, 19 Cal.3d at 34, 136 Cal.Rptr. at 581, 560 P.2d at 10 ("the same enterprise").

There is another flaw in plaintiff's argument: the Connecticut corporation was not a going concern at the time of the sale of its assets; therefore, the California corporation would have been unable in any event to "exploit," *see id.*, the Connecticut corporation's reputation as a going concern. Rather, the California corporation was relegated to publicizing that it would build the same quality *product* that had been built in Connecticut. *See* Deposition of Robert B. Matheson at 30.

Plaintiff has the burden of demonstrating that he fits within the *Ray* product line exception. Yet he has not pointed to any evidence relevant to his argument. Under these circumstances, it would be unfair to impose product line liability on the California corporation. *Ray* requires that the successor "continue[ ] the predecessor's commercial activity in an essentially unchanged manner," *Ramirez v. Amsted Industries, Inc.*, 171 N.J.Super. at 269–70, 408 A.2d at 823, or, at the very least, that the successor hold itself out as the same manufacturing enterprise, *see Ray v. Alad Corp.*, 19 Cal.3d at 34, 136 Cal.Rptr. at 581, 560 P.2d at 10. In this case, the California corporation resumed the manufacture and sale of a product after an almost three year hiatus; it did

6. *See* note 2 *supra.*

so under drastically changed circumstances; and it did not hold itself out as the same *entity*. To impose liability here would undermine the three-prong *Ray* test and lead rather to the imposition of product line liability without regard to the relationship of the predecessor and successor corporations. I therefore conclude that plaintiff has failed to satisfy the third facet of the *Ray* test. Since he has also failed to satisfy the second requirement of this test, I hold that plaintiff cannot impose product line liability on the California corporation.

Plaintiff cites *Ramirez v. Amsted Industries, Inc., supra* in support of his product line argument. However, *Ramirez* is similarly distinguishable since there was continuity between the two manufacturing entities. *See Ramirez v. Amsted Industries, Inc.*, 171 N.J.Super. at 266, 408 A.2d at 821 (the contract between the two corporations "clearly contemplate[d] the transfer of a viable, operating manufacturing company to the [successor]"); *id.* at 269–70, 408 A.2d at 823 (the more liberal rules of successor liability apply "where the successor has acquired and has continued the predecessor's commercial activity in an essentially unchanged manner"); *id.* at 278, 408 A.2d at 827 (the successor corporation "continue[d] essentially the same manufacturing operation as the predecessor corporation"); *see also Wilson v. Fare Well Corp.*, 140 N.J.Super. at 490, 356 A.2d at 466 ("The more a corporation physically resembles its predecessor . . . the more reasonable it is to hold the successor fully responsible.").

### 5. Conclusion

The product line theory of successor liability is an exception to the general rule that a successor corporation is not liable for tort liabilities of its transferor. Were I to agree with plaintiff under the present circumstances, this exception would eviscerate the general rule. Thus the California corporation cannot be held liable under any of the five exceptions to the general rule. I will therefore grant the California corporation's motion for summary judgment with respect to this basis of liability.

### B. Duty to Warn

#### 1. Introduction

As a second basis for holding the California corporation liable, plaintiff states that the California corporation is liable under traditional tort principles because it breached its duty to warn past purchasers of tip tanks of any defects which subsequent testing disclosed, or should have disclosed, between the date of the purchase of the Connecticut corporation's assets and the time of the accident.[7] A successor corporation can be held independently liable for a failure to warn of preexisting defects. *Gee v. Tenneco, Inc., supra; Travis v. Harris Corp., supra; Leannais v. Cincinnati, Inc., supra; Fehl v. S. W. C. Corp., supra; Shane v. Hobam, Inc., supra; Andrews v. John E. Smith's Sons Co., supra; Wilson v. Fare Well Corp., supra.* However, this theory is inapplicable here.

#### 2. Discussion

■ Succession alone does not impose a duty to warn of recently discovered defects. *Gee v. Tenneco, Inc.*, 615 F.2d at 866. Rather this duty arises only when there is succession to, or assumption of, a predecessor's service contracts, coverage of the particular product under the service contract, service of that machine by the successor, and knowledge of defects and of the location or owner of the machine. *Travis v. Harris Corp.*, 565 F.2d at 449; *Leannais v. Cincinnati, Inc., id.* at 442; *Fehl v. S. W. C.*

---

**7.** Plaintiff's "argument" is concise: "[a]t the very least, fact issues exist concerning [the California corporation's] liability under this theory." Plaintiff's Memorandum in Opposition to Defendant Flight Extenders, Inc.'s Motion for Summary Judgment at 13 (citations omitted). However, plaintiff has not set forth specific facts or, indeed, any facts, showing the existence of genuine issues for trial; he has therefore failed to follow the dictates of Fed.R. Civ.P. 56(e). I have not granted the California corporation's motion on this ground, however. Rather I have reviewed the affidavits and depositions on file. *Cf. Corsette v. Johns-Manville Corp.*, C.A. No. 78–3070 (E.D.Pa. Jan. 27, 1981) (unhelpful briefs; court refused to make painstaking search of the record).

*Corp.*, 433 F.Supp. at 949; *Shane v. Hobam, Inc.*, 332 F.Supp. at 529–30; *Andrews v. John E. Smith's Sons Co.*, 369 So.2d at 784–85; *Wilson v. Fare Well Corp.*, 140 N.J.Super. at 492, 356 A.2d at 467–68.

█ There can be no such duty here since the California corporation did not continue the Connecticut corporation's service contract; indeed there was none. Moreover, there is no evidence that the California corporation ever serviced or repaired a tip tank that had been manufactured by the Connecticut corporation. At most, past purchasers may have contacted Matheson in order to ask questions or to get some spare parts. Deposition of Robert B. Matheson at 33–34. Such contact may have been of some "potential economic advantage," W. Prosser, Law of Torts 339 (4th ed. 1971), because it was a further way of publicizing the resumption of the manufacturing of tip tanks. *See* Deposition of Robert B. Matheson at 33. However, there is no evidence that these contacts brought, or should have brought, to its attention defects in its predecessor's products. I therefore conclude that such benefit, if any, is insufficient to extend the liability for any alleged nonfeasance, *see generally* W. Prosser, Law of Torts 339 (4th ed. 1971), especially because the California corporation did not actively seek out these past customers in order to sell spare parts. Otherwise, a duty to warn would arise in any circumstance in which a successor has *any* dealings with its predecessor's customers. This is not the test, however.

Plaintiff relies on *Shane v. Hobam, Inc., supra* and *Wilson v. Fare Well Corp., supra.* Both cases are inapposite. In *Shane*, the successor continued to have the responsibility for servicing equipment previously manufactured and serviced by its predecessor. Judge Higginbotham held that if plaintiff were successful in establishing both that the successor serviced the allegedly defective machine, and that the successor knew it was defective, a duty to warn then, and only then, would arise. He therefore denied the successor's motion for summary judgment pending further discovery on these latter two issues. *Wilson v. Fare Well Corp.* is likewise distinguishable because the successor continued servicing products that had been manufactured and serviced by its predecessor. 140 N.J.Super. at 482, 356 A.2d at 461. Counsel has not cited, nor have I found, any case in which there was a duty to warn in the absence of a continued servicing arrangement. *See Gee v. Tenneco, Inc.*, 615 F.2d at 866 (successor's knowledge of defects does not raise a duty to warn absent continuation of relationship between successor and the customers of the predecessor); *Travis v. Harris Corp.*, 565 F.2d at 448–49 (special relationship required before there can be a duty to warn); *Leannais v. Cincinnati, Inc., supra; Andrews v. John E. Smith's Sons Co., supra; Fehl v. S. W. C. Corp., supra; see also Holloway v. John E. Smith's Sons Co.*, 432 F.Supp. 454, 456 n.1 (D.S.C.1977) (alternative holding).

### 3. Conclusion

I therefore conclude that the California corporation did not have a duty to warn past purchasers of recently discovered defects. I shall grant the California corporation's motion for summary judgment with respect to this alternative basis of liability.

### IV. Conclusion

Plaintiff cannot impose successor liability on the California corporation; nor can it impose liability based on the California corporation's failure to warn. I will grant the motion for summary judgment in full and enter judgment for the California corporation and against the plaintiff.