**In re ASBESTOS LITIGATION (BELL).**

Superior Court of Delaware, New Castle County.

Submitted: July 10, 1986.
Decided: Aug. 26, 1986.

Thomas C. Crumplar and Mary Ann Matuszewski of Jacobs and Crumplar, Wilmington, for plaintiffs.

Jeffrey M. Austin and Howard M. Berg of Howard M. Berg & Associates, P.A., Wilmington, for Nicolet.

POPPITI, Judge.

The matter is presently before the Court on Nicolet, Inc.'s ("Nicolet") motion for partial summary judgment against all plaintiffs, on the grounds that it cannot be held liable as the successor-in-interest to Keasbey & Mattison Company ("K & M"). The following facts are not in dispute:

In April of 1962, Nicolet, a Delaware corporation, learned that K & M was dissolving and that its parent company, Turner & Newall, Ltd., was disposing of its assets. The assets consisted of the Asbestos Cement Pipe Division, purchased by Certain-Teed Products Corporation ("Cer-

tain-Teed"); the Roofing Division, purchased by Bird & Sons, Inc.; the Asbestos Textile Division, purchased by American Asbestos Textile Corporation; the Building Material Division, which was discontinued; and the Industrial Products Division. This last division generated 20% of K & M's revenues, and only 5% of its profits. On September 25, 1962, Nicolet entered into an Agreement of Sale with K & M to purchase the Industrial Products Division. The sale was consummated on September 28, 1962.

Under the terms of the agreement of sale, Nicolet purchased the land, buildings, fixtures, machinery, equipment, raw materials and supplies, work in progress and finished goods inventories, and various records and files relating to K & M's Industrial Products Division. In addition, Nicolet received the patents, trademarks, trade names and the good will related to the trademarks and trade names connected with this Division, subject to the rights of others created prior to the agreement. Thus, while Nicolet received the right to use the name "Keasbey & Mattison Company," a similar right was granted to Certain-Teed. Finally, all of the insurance coverage in effect on behalf of K & M was transferred to Certain-Teed, and not to Nicolet.

Consideration for the sale consisted of cash, delivery of a note and mortgage and the assignment of a mortgage of premises previously owned by Nicolet. No shares of stock in Nicolet were involved, nor did any officers or directors of K & M go to Nicolet. Nicolet did hire approximately 25% of K & M's former employees.

The agreement of sale also provided that Nicolet would not assume any obligations or liabilities of K & M, except as set forth in the agreement. Paragraph 11 of the agreement affirmed K & M's intention to cease to do business and to dissolve. Paragraph 13 provided that the agreement would be governed by Pennsylvania law.

The first question becomes does the law of Delaware (the place of the tort) or the law of Pennsylvania (the place of the contract) apply to this case in deciding the issue of successor liability. If the issue of successor liability is viewed as one of tort law, Delaware courts have ruled that the law of the place of the tort applies. *See Sellon v. General Motors Corp.*, D.Del., 521 F.Supp. 978, 981 (1981); *Walsh v. Newark Day Nursery Assoc.*, Del.Super., C.A. No. 82C–MR–127, Bifferato, J. (Jan. 28, 1985) at 2. In the instant case if tort law controls, since the alleged tortious exposure to asbestos occurred in Delaware, Delaware law would control. If, however, the issue of successor liability is considered to be a contractual issue the law to be applied would be that of the state with the most significant relationship to the transaction. *Sellon*, 521 F.Supp. at 981; *Walsh v. Newark Day Nursery Assoc., supra*, at 2. In this case, if contractual law controls, since the sale agreement was formed in Pennsylvania, the locus of the subject matter of the agreement was in Pennsylvania, the transfer of assets occurred in Pennsylvania, and the parties provided that Pennsylvania law would govern the contract, I am satisfied that Pennsylvania would be the state with the most significant relationship to the transaction, and therefore Pennsylvania law would apply.

Other courts have already considered the Nicolet—K & M successor liability issue. There is however no unanimity in the opinions. While many of the courts have treated the issue as a contractual one and applied Pennsylvania law, *see, e.g., Wells v. Raymark Industries*, M.D.Fla., No. 84–11–Civ–J–14, Black, J. (March 13, 1985); *In re Nicolet, Inc.*, D.Mass., Mass. Asbestos Litigation, M.M.L. No. 1 & 2, Zobel, J. (April 15, 1985); *Standal v. Armstrong Cork Co.*, Minn.App., 356 N.W.2d 380 (1984); *Carpenter v. Combustion Engineering Inc.*, N.D.Ohio, C.A. No. C78–224, Krupansky, J. (March 15, 1979); other courts have considered the question to be one of tort law and applied the law of the place of injury, *see, e.g., Reed v. Armstrong Cork Co.*, E.D.Ark., 577 F.Supp. 246 (1983); *Rose v. Armstrong World Industries, Inc.*, Fla.

Circ.Ct., C.A. No. 79–13071, Vann, J. (Jan. 13, 1983); *Tarjanyi v. Sun Oil Co.*, Ohio Ct.Comm.Pleas, C.A. No. 83–2900, Walters, J. (March 15, 1985).

▆ The argument for the application of tort law is that the issue of successor liability is one of tort liability, that is whether Nicolet is liable for the tortious acts of K & M. I am satisfied, however, that while questions of negligence and what constitutes tortious conduct are properly decided by Delaware law, the focus of the successor liability issue is more properly on the legal effect of the 1962 contractual transaction between Nicolet and K & M. Under Delaware choice-of-law rules, therefore, I am satisfied that the legal effect of the transaction should be considered by applying Pennsylvania law. *See Walsh v. Newark Day Nursery Assoc.*, Del.Super., C.A. No. 82C–MR–127, Bifferato, J. (Jan. 28, 1985) (while Delaware law applies as to negligence issues, legal effect of transaction between parties will be determined by the law of the state with the most significant relationship to the transaction). I now then turn to that Pennsylvania analysis.

▆ When one corporation sells or transfers its assets to another, the general rule of law in Pennsylvania is that the purchaser does not become liable for the obligations of the seller merely as a result of the sale. *Knapp v. North American Rockwell Corp.*, 3d Cir., 506 F.2d 361, 363 (1974); *Dawejko v. Jorgensen Steel Co.*, Pa.Super., 290 Pa.Super. 15, 434 A.2d 106, 107 (1981). A purchaser may however be liable for the obligations of the selling corporation if any one of the following four elements is present: (1) the purchaser expressly or impliedly assumes such obligations; (2) the transaction amounts to a consolidation or merger of the seller into the purchaser; (3) the purchaser is merely a continuation of the seller; or (4) the transaction has been entered into fraudulently. *Knapp*, 506 F.2d at 363–64; *Jacobs v. Lakewood Aircraft Service, Inc.*, E.D. Pa., 512 F.Supp. 176, 179 (1981); *Dawejko*,

434 A.2d at 107. I will briefly discuss each of these elements seriatim.

### Express or Implied Agreement

The sale agreement provided that K & M would "indemnify and hold harmless Buyer against any loss or damages (including any court costs or lawyers' fees) which may be suffered by Buyer as the result of the assertion against Buyer ... of any legal obligations or liabilities of Seller (other than legal obligations and liabilities expressly assumed by Buyer pursuant to the provisions hereof) existing on the Date of Closing." No such "express assumption" of K & M's liability for its sales of asbestos products by its Industrial Products Division is evidenced in the agreement. Further plaintiffs do not draw my attention to any clause in the contract that would give rise to an implied assumption of liabilities.

### Consolidation or Merger

A consolidation occurs when two corporations combine to form a new corporation. *Savini v. Kent Machine Works, Inc.*, E.D. Pa., 525 F.Supp. 711, 716 (1981). It is clear that no consolidation occurred as a result of the transaction in question.

A merger occurs when the seller is absorbed into the purchaser. *Savini*, 525 F.Supp. at 711. Plaintiffs do not claim that the transaction was a *de jure* merger. As for a *de facto* merger, two essential elements are that there be a continuity of shareholders and that the consideration paid must include shares of stock. *Savini*, 525 F.Supp. at 716; *Jacobs*, 512 F.Supp. at 181. In the present case Nicolet exchanged no shares for the assets of K & M. Moreover, K & M was not absorbed into Nicolet. Indeed, the evidence shows that K & M did not dissolve until 1967, five years after the sale. I am satisfied therefore that no merger has occurred.

### Continuation

"The primary elements of 'continuation' include the common identity of the officers, directors, or stockholders in the predeces-

sor and successor corporations, and the existence of only one corporation at the completion of the transfer." *Jacobs*, 512 F.Supp. at 181. As noted above, there was no common identity of officers, directors or stockholders in Nicolet and K & M. Moreover, both corporations existed at the end of the transfer.

Plaintiffs argue that a continuation did occur since Nicolet continued the business of the Industrial Products Division. The court in *Jacobs*, however, speaks in terms of a continuation of the selling corporation as an entire entity and not of a mere part of—that is, a division of—that corporation. I am satisfied, therefore, that Nicolet is not a continuation of K & M.

### Fraud

Plaintiffs do not argue that the transaction was entered into fraudulently. Nicolet is not liable under this exception either.

### Product Line

Pennsylvania law recognizes one additional exception to the general rule. This is known as the "product line" exception. The rule, as set forth in *Dawejko v. Jorgensen Steel Co.*, Pa.Super., 290 Pa.Super., 434 A.2d 106 (1981), states:

> [W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Dawejko*, 434 A.2d at 110 (quoting *Ramirez v. Amsted Industries, Inc.*, N.J. Supr., 86 N.J. 332, 431 A.2d 811, 825 (1981)).

The product line exception was first articulated by the California Supreme Court in the case of *Ray v. Alad Corp.*, Ca.Supr., 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977). It appears that the exception arose

out of the same public policy considerations which gave birth to strict liability, that is that the manufacturer or its successor is in a better position than the consumer to insure against the risk of a defective product, and that the cost of compensating defenseless victims should be spread throughout society. *Hickman v. Thomas C. Thompson Co.*, D.Colo., 592 F.Supp. 1282, 1284 (1984). The justification for imposing liability on such a successor to the original manufacturer is founded on three factors:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business,
>
> (2) the successor's ability to assume the original manufacturer's risk-spreading [role], and
>
> (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Ray v. Alad Corp.*, Ca.Supr., 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3, 9 (1977).

The *Dawejko* court chose to phrase the product line exception in general terms, so that in a particular case the court could consider whether it is in the interest of justice to impose liability on the successor corporation. *Dawejko*, 434 A.2d at 111. In this regard the court listed several elements which it concluded would be important to consider. These elements include whether the successor advertised itself as an on-going enterprise; whether it maintained the same product name, personnel, property and clients; whether it acquired the predecessor's name and good will; and whether it required the predecessor to dissolve. *Dawejko*, 434 A.2d at 111.

The various courts which have considered the Nicolet-K & M transaction under the Pennsylvania product line exception have not agreed as to the result. Some have held that Nicolet is not a successor to

K & M. *See, e.g., Wells v. Raymark Industries,* M.D.Fla., C.A. No. 84–11–Civ–J–14, Black, J. (March 13, 1985); *Foster v. Johns-Manville Sales Corp.,* D.Iowa, C.A. No. C 82–0033, *et al.,* Hodges, J. (Jan. 16, 1985); *Carpenter v. Combustion Engineering Inc.,* N.D.Ohio, C.A. No. C 78–224, Krupansky, J. (March 15, 1979). Other courts have ruled that the facts are sufficient to justify the imposition of liability on Nicolet under the product line theory. *See, e.g., Pendley v. Combustion Engineering Inc.,* N.D.Ga., C.A. No. 77–632 A, Freeman, J. (Nov. 30, 1979); *In re Nicolet, Inc.,* D.Mass., Mass. Asbestos Litigation, M.M.L. No. 1 & 2, Zobel, J. (April 15, 1985); *Standal v. Armstrong Cork Co.,* Minn.App., 356 N.W.2d 380 (1984).

■ Having examined and analyzed the facts of the transaction in light of the considerations articulated by the *Dawejko* court, I am satisfied that this Court should join those which have ruled Nicolet not liable as a successor to K & M.

A fundamental prerequisite to the application of the product line exception is the determination of "whether all or substantially all of the assets of the predecessor corporation were acquired by the successor, thereby vitiating plaintiff's remedies against the predecessor as the responsible and viable tortfeasor." *Pizio v. Johns-Manville Corp.,* Pa.C.C.P., C.A. No. 2676, Takiff, J. (Feb. 9, 1983) at 4–5. While it is true as plaintiffs suggest that Nicolet did obtain substantially all of the assets of the Industrial Products Division, the assets in question clearly did not comprise all or substantially all of the assets of K & M. I am satisfied that the prerequisite is, therefore, not met.

Plaintiffs also maintain that since K & M expressed its intention to dissolve at the time of the sale, Nicolet's purchase of the Division resulted in the virtual destruction of the plaintiffs' remedies against K & M. While the sale agreement did express K & M's intention to dissolve, it was not a necessary requirement of the sale. In point of fact, K & M did not dissolve until five years after the sale. While the plaintiffs suggest that the continued existence of K & M may be considered as a sham, noting that in *Knapp v. North American Rockwell Corp.,* 3d Cir., 506 F.2d 361 (1984) the court found a *de facto* merger despite the fact that the selling corporation existed for 18 months after the sale, the transaction *sub judice* is substantially different from that examined by the court in *Knapp.* First, five years is a significantly longer time than 18 months; second, K & M was not required to dissolve in the sale agreement, and finally, K & M did not dissolve until after Nicolet stopped making the product line it acquired from K & M. In this regard I note that Nicolet's last shipment of thermal insulation products from their Ambler plant was in 1965. In light of these facts, I conclude that the continued existence of K & M can not be ignored.

The question then is, presuming for purposes of this motion that plaintiffs' remedies against K & M have been destroyed, whether Nicolet is responsible for that destruction. Taking into consideration the continued existence of K & M for five years after Nicolet's purchase, and considering that Nicolet purchased only a small portion of K & M's assets, the major portion of the assets having been purchased by Certain-Teed, I conclude that Nicolet is not responsible for any destruction of the plaintiffs' remedies. In so holding, I am aware of the case of *Amader v. Pittsburgh Corning Corp.,* E.D.Pa., 546 F.Supp. 1033 (1982), which held, in predicting Pennsylvania law, that a company may be liable under the product line exception although it only purchased a portion of the assets of a predecessor corporation and even though the predecessor corporation still existed and was in fact a party to the suit. This decision, however, has been criticized and rejected by Pennsylvania courts. *See Pizio v. Johns-Manville Corp.,* Pa.C.C.P., C.A. No. 2676, Takiff, J., (Feb. 9, 1983); *Marano v. Johns-Manville Corp.,* Pa.C.C.P., C.A. No. 88 (123) Case No. 108, Takiff, J. (Sept. 15, 1982) (ORDER). I am satisfied that

*Amader* does not reflect the present state of the law of Pennsylvania in this regard.

The next question becomes did Nicolet assume K & M's risk-spreading role? While Nicolet did obtain substantial property of the Industrial Products Division and K & M's customer list, it did not obtain any of K & M's insurance coverage, all such coverage having apparently been transferred to Certain-Teed. This of course did not prevent Nicolet from obtaining its own coverage, or passing the cost of such insurance on to its customers. Since Nicolet was a manufacturer, it was possible for it to assume a manufacturer's risk-spreading role. To this limited extent, then, Nicolet does fulfill one requirement of the product line exception. I do not, however, place much weight on this factor.

The final question focuses on the fairness of requiring Nicolet to assume K & M's liabilities as a burden attached to the enjoyment of K & M's good will in the continued operation of the business of the Industrial Products Division. In this regard, I consider whether Nicolet acquired the use of K & M's name and good will, and whether it advertised itself as K & M's on-going corporation. While Nicolet did acquire the right to use the K & M name, and hence its good will, this right was not exclusive, since a similar right had been granted to Certain-Teed. Further, while Nicolet did market its products with the legend "Keasbey & Mattison Company, Division of Nicolet Industries, Inc." evidence suggests that Nicolet's marketing staff informed the customers that they had bought this Division from K & M. Indeed, the evidence suggests that Nicolet wanted the K & M customers to become familiar with Nicolet. Nicolet maintains, therefore, that it did not attempt to pass itself off as the same enterprise as K & M. The plaintiffs attempt to rebut this by introducing the testimony of Gregory Stagliano, President of Delaware Insulation which occasionally made small purchases from K & M. Stagliano testified that he didn't realize that Nicolet had purchased K & M. Even viewing the facts in the light most favorable to the plaintiffs, given the undisputed fact that Nicolet's name was on the invoices, that it referred to its acquisition as a division of Nicolet, and that the sales staff represented themselves as Nicolet to regular customers, I am satisfied that the mere fact that Stagliano, a minor customer at best, was confused is an insufficient basis for a reasonable jury to conclude that Nicolet attempted to pass itself off as K & M or as an on-going corporation. *See Cropper v. Rego Distribution Center, Inc.*, D.Del., 542 F.Supp. 1142, 1150 (1982) (if there are undisputed facts which can compel reasonable persons to draw only one conclusion, summary judgment is appropriate); *Hercules Powder Co. v. DiSabatino*, Del.Supr., 188 A.2d 529, 535 (1963) (Same).

I am satisfied that Nicolet is not liable under Pennsylvania's product line exception. While it may be that Nicolet fits some of the criteria established by Pennsylvania courts, it does not satisfy a sufficient number of them to justify the imposition of liability on Nicolet in contravention to the established general rule that when one company sells or transfers its assets to another, the purchaser does not acquire the liabilities of the seller merely because of the sale.

■ Plaintiffs finally suggest that Nicolet is independently liable for its failure to warn K & M's customers about the dangers of asbestos. The basis of plaintiffs' argument is premised on the holding in *Shane v. Hobam, Inc.*, E.D.Pa., 332 F.Supp. 526 (1971), where the court ruled that a successor corporation may acquire a duty to warn its predecessor's customers of defects in a product if the successor 1) took on certain positive responsibilities with respect to the product, such as a continuing service contract; 2) had actual or constructive knowledge of the defect; and 3) benefited from the good will and reputation of the predecessor.

The focus of the *Shane* standard is clearly on the actions of Nicolet, namely whether its failure to warn was a tortious activity. Under the conflict of laws analysis

discussed earlier, I conclude that Delaware law would apply because Delaware is the place of the tort. *See Walsh v. Newark Day Nursery Assoc.*, Del.Super., C.A. No. 82C–MR–127, Bifferato, J. (Jan. 28, 1985). Delaware has not yet adopted the *Shane* standard.

Even if the Court applied the Pennsylvania *Shane* standard I am satisfied that Nicolet would not be liable. In this regard plaintiffs note that, as part of the sale agreement, Nicolet agreed to accept certain leases, contracts and agreements from K & M, including a service agreement. This service agreement, however, did not involve K & M's thermal insulation. Nicolet was not therefore under any contractual duty to service the asbestos insulation already sold. Thus, the factual situation here is different from that in *Shane*, which dealt with defective machinery that the successor corporation had agreed to service. Since Nicolet does not even satisfy the first *Shane* requirement of having taken on "certain positive responsibilities" with regard to the product, I need not even reach the last two requirements.

Having stated the above, Nicolet's motion for partial summary judgment on the issue of successor liability is, therefore, HEREBY GRANTED.

IT IS SO ORDERED.