**Carl SAVINI, Administrator of the Estate of Carlo Savini, Deceased**

v.

**KENT MACHINE WORKS, INC., a subsidiary of Charles Ross & Son, Inc.**

Civ. A. No. 80–0096.

United States District Court, E. D. Pennsylvania.

Oct. 29, 1981.

Donald J. P. Sweeney, Philadelphia, Pa., for plaintiff.

John P. Penders, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

This is a products liability action brought by plaintiff, Carl Savini, as Administrator of the Estate of Carlo Savini, the decedent. Plaintiff seeks damages based on claims of negligence, warranty and strict liability. Presently before the Court is defendant's motion for summary judgment. The issue presented is whether defendant Charles Ross & Son Co., Inc. is a successor corporation to Kent Machine Works, Inc. for purposes of this product liability action. For the reasons which follow, defendant's motion will be granted and judgment will be entered against plaintiff and in favor of defendant.[1]

### I. *Facts*

On January 11, 1978, plaintiff's decedent, Carlo Savini, sustained serious bodily contu-

sions and a fracture of his right knee after his sweater became caught in a three roll ink mill machine operated by Savini for his employer, Crown, Cork & Seal Co., located in Philadelphia, Pennsylvania. On March 26, 1979, Savini died after suffering a heart attack. Plaintiff now asserts, on behalf of the decedent, that the injuries suffered in January, 1978, aggravated and compounded the decedent's pre-existing heart condition and thus caused his death. Plaintiff seeks damages on behalf of the surviving family members and the estate.

The three roll ink mill machine was manufactured and designed by Kent Machine Works, Inc. ("Kent") and sold to decedent's employer, Crown, Cork & Seal Co., in 1939. Kent was incorporated in 1919 and was located in Brooklyn, New York. Kent manufactured mixers and three roll mills until January 28, 1970, when its shareholders formally voted to cease operations and dissolve the corporation. In the course of liquidating assets prior to dissolution, Kent sold its real estate, which included the manufacturing plant and some of its contents, to Bernard Magrill Company and Consolidated Edison Company of New York, Inc. for cash in an amount exceeding $100,000.00. In addition, Kent contracted with Charles Ross & Son Co., Inc. ("Ross") to sell to Ross the following assets shown in the Bill of Sale dated May 14, 1969:

> . . . all of its rights to the name "KENT MACHINE WORKS", telephone number (212 TR 5–8470), all of its patent, trademark and trade name rights, all company records, list of all company customers, list of machinery locations, all manufacturing, files, all drawings (tracing and sepias), all patterns, jigs and fixtures for manufacturing company's products, and inventory as set forth hereafter.

A proviso was contained in a contemporaneous agreement of sale that provided:

---

1. A motion for summary judgment under Fed. R.Civ.P. 56 must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The

evidence presented to the Court, and the inferences to be drawn therefrom, "must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

[i]t is understood and agreed that Kent cannot and does not convey herein the corporation or corporate structure known as Kent Machine Works, Inc., and that Kent retains same and its corporate status solely for the purpose of completing liquidation commenced under the Internal Revenue Acts and for no other reason. Kent will execute and deliver a written consent to Ross, permitting Ross to incorporate a new corporation under the name Kent Machine Works, Inc., or other similar name or style, following the finalization of the liquidation of Kent

. . . .

*Agreement,* Paragraph 1 (May 14, 1969). *See also* Letter from Kent Machine Works, Inc. to New York Department of State (February 9, 1970) (notification of dissolution of Kent Machine Works, Inc.). Ross paid $18,704.00 total consideration for these assets on an "as is where is" basis.[2] Kent was dissolved in 1970.[3]

Charles Ross & Son, Inc. is a close corporation incorporated in 1899 and located in Hauppauge, New York. Ross, which owns a number of other small subsidiaries, employs approximately fifty employees and has annual sales of approximately $5,000,-000.00 each year. Deposition of Richard Ross, at 5–6, 10. Ross manufactures and sells industrial equipment including rolling devices and mixing machines. *See Ross Mixing Equipment Brochure.*

Richard Ross, President of Ross, states in his deposition that, pursuant to the agreement, the company received some blueprint and file cabinets, a gear cutter, machine parts and a set of old rolls. Deposition of Richard Ross, at 17–19. It is not known whether these file cabinets also contained old Kent records, customer lists and machinery locations for most of these records have been destroyed. Deposition of Richard Ross, at 19; Deposition of Jerome S. Medowar, at 88–89. Prospective customer inquiries and letters for Kent equipment were also forwarded to Ross by the Post Office under a forwarding order at Kent Machine Works, Inc. following the sale. Deposition of Jerome Medowar, at 95–97. Ross rebuilt Kent three roll ink mills, which were in need of servicing, both before and after the sale. Deposition of Richard Ross, at 44.

Ross manufactures and sells laboratory three roll ink mills in a bench model and a floor model. *Ross Mixing Equipment Brochure,* at 9. This floor model three roll ink mill was originally manufactured by Roy Allen, an independent manufacturer, and marketed by Ross under the name "GPE mill." After acquiring the trademark rights to "Kent Machine Works" in the asset sale in 1969, Ross renamed the "GPE mill" manufactured by Roy Allen, the "Kent mill" and marketed it under that name. Roy Allen went out of business in 1980 and Ross itself took over the manufacture of the "Kent mill." Deposition of Richard Ross, at 51–53. According to estimates, Ross sells five to ten "Kent mills" each year. Deposition of Richard Ross, at 53–54. The current price of Kent mills is about $6,000.00 each. *See Price Sheet,* 4 × 8 Laboratory High Speed Three Roll Mill (Effective February 15, 1981). The sale of Kent mills, thus, accounts for approximately two to three percent of the company's annual sales. Deposition of Richard Ross, at 79.[4]

2. Under the agreement, $15,000.00 was for the records, files, drawings and name; $2,500.00 was for the jigs and patterns; and $1,204.00 was for miscellaneous machine parts inventory. *See* Letter from Kent Machine Works, Inc. to Charles Ross & Son Co., Inc. (May 1, 1969).

3. Two other provisions contained in the agreement are also notable. Paragraph 5a provided that Ross could, at its option, offer employment to Nicholas DeSena, a Kent employee, following the termination of Kent Machine Works, Inc. Secondly, paragraph 5b provided that the stockholders, directors and officers of Kent would agree not to compete with Ross for one year following the date of the agreement by not manufacturing or selling machines or products similar to the "business herein sold by Kent" and that they would not solicit former Kent customers for the repair and servicing of products and machines formerly manufactured by Kent. Agreement (May 14, 1969).

4. Standard & Poor's Corporate Directory of New York, New York, listed Kent Machine Works, Inc. as a "subsidiary" of Charles Ross

## II. *Discussion*

### A. Corporate Successor Liability

■ Generally, the rule of corporate successor liability is that:

... when one company sells or transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor simply by virtue of its succession to the transferor's property. In order to find that this general rule is not applicable and that the transferee does acquire such liability, one of the following must be shown: (1) the purchaser expressly or impliedly agrees to assume such obligation; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is fraudulently entered into to escape liability.

*Husak v. Berkel, Incorporated*, 234 Pa.Super. 452, 456–457, 341 A.2d 174, 176 (1975). *See also Knapp v. North American Rockwell Corp.*, 506 F.2d 361, 364 (3d Cir. 1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975); *Jacobs v. Lakewood Aircraft Service, Inc.*, 512 F.Supp. 176, 179 (E.D.Pa.1981); *Woody v. Combustion Engineering, Inc.*, 463 F.Supp. 817, 819 (E.D. Tenn.1978) (applying Pennsylvania law); *Shane v. Hobam, Inc.*, 332 F.Supp. 526, 527–528 (E.D.Pa.1971) (applying New York law). Unless one of these exceptions applies in this case, Ross cannot be held liable for the defects of the three roll ink mills previously manufactured by Kent. Plaintiff essentially argues that one or more of these exceptions do apply. Although plaintiff's memorandum of law blends these theories together, the Court will discuss each exception *seriatim*.[5]

### (1) *Express or Implied Assumption of Liabilities*

■ Plaintiff contends that the affidavit of Elmer Peters, President of Kent, which states "[t]hat the corporation is not indebted to any one and has no creditors," raises a material issue of fact whether Ross expressly or impliedly assumed the liabilities of Kent. Affidavit of Elmer Peters (May 16, 1979). This affidavit was executed in connection with the sale of assets by Kent to Ross. Affidavits submitted by the defendant and the deposition testimony of Ross executives deny any express or implied agreement with Kent to assume the latter's liabilities. Affidavit of William P. Tucker, Attorney for Kent Machine Works, Inc.; Deposition of Jerome Medowar, at 111–12. None of the existing contractual obligations of Kent were assumed by Ross. Deposition of Jerome Medowar, at 105, 122, 130. *Compare* Letter from Richard Ross to Elmer Peters (April 1, 1969) *with* Letter from Kent Machine Works, Inc. to Richard Ross (May 1, 1969). Plaintiff argues, however, that if Ross only intended to purchase the

---

& Son Co., Inc. from 1971 to 1980. Affidavit of Carmine J. Assenato, Manager of Register Department of Standard & Poor's Corporate Directory. *See also Proof for Standard & Poor's Register of Corporations, Directors and Executives*, Kent Machine Works, Inc. (Subs. Charles Ross & Son Co.). This listing identified the identical officers and address of Ross for that of Kent Machine Works, Inc. Similarly, the New York Telephone Directory has listings for both Kent Machine Works, Inc. and Charles Ross & Son Co., Inc. at the same telephone number. Affidavit of Edward G. Mintzer, Jr. *Jerome Medowar, the Secretary of Ross and a* member of the Board of Directors, states in his deposition that he is unaware of how Standard & Poor's acquired this listing. Deposition of Jerome Medowar, at 133. This listing has now been removed from the corporate directory. Letter from Carmine J. Assenato to Charles Ross & Son Co. (May 23, 1980).

5. A threshold issue faced by the Court is which law applies in this case—Pennsylvania or New York law. Applying the choice of law rules of the forum state, Pennsylvania, see *Klaxon Co. v. Stentor Electrical Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and the governmental interest analysis mandated by the Pennsylvania Supreme Court's decision in *Griffith v. United Airlines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964), it would appear that Pennsylvania law applies because the decedent had been injured in Pennsylvania, the decedent had been a domiciliary of Pennsylvania, and plaintiff and the heirs of decedent's estate are also domiciliaries of Pennsylvania. The Court need not decide this issue, however, because for purposes of this motion there is no ultimate conflict since the result herein reached would be the same under both Pennsylvania and New York law.

assets of Kent, then it need not have executed the affidavit of Elmer Peters which contained assurances that no liabilities or debts exist. Certainly, such precautions as taken by Ross are not unusual or uncommon. The purpose of the affidavit was to protect Ross Company's newly acquired assets, including the trademark of "Kent Machine Works," from the claims of creditors by obtaining such assets free of encumbrances. It is not reasonably inferrable that Ross intended to assume outstanding liabilities once Kent had assured the former that such liabilities did not exist. It is also clear that Ross did not *expressly* assume the outstanding liabilities of Kent, such as those which may only arise after the previous defect in manufactured equipment is later discovered. In contrast, in *Bouton v. Litton Industries, Inc.*, 423 F.2d 643, 652 (3d Cir. 1970), the Third Circuit held that the purchasing corporation, Litton Industries, assumed the risks of future product liability claims arising from the predecessor's faults after purchasing the assets of McKiernan-Terry Corporation because Litton had expressly agreed to assume McKiernan-Terry Corporation's liabilities as part of the agreement and also received McKiernan-Terry Corporation's product liability insurance in the transfer. A similar expression of intent to assume such liabilities is not present under the facts in this case. For this reason and others discussed below, the Court holds that Ross did not expressly or impliedly assume the liabilities of Kent.

### (2) *Merger or Consolidation*

■ A merger is found when the seller corporation is absorbed into the purchasing corporation and the seller corporation thereby loses its identity as a separate corporate entity. *Knapp v. North American Rockwell Corp.*, 506 F.2d 361, 365 (3d Cir. 1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975). By contrast, a consolidation takes place when two or more corporations combine and form a new corporate entity after the previous corporate identities are dissolved. *Id.* Under the present facts, neither event occurred in this case. It is plain in the record that no certificate of incorporation has been filed for either Kent Machine Works, Inc. as a subsidiary to Charles Ross & Son Co., Inc., or for Charles Ross & Son Co., Inc. reflecting a consolidation of the old Charles Ross & Son Co., Inc. with Kent Machine Works, Inc.

Plaintiff relies on *Knapp v. North American Rockwell, supra*, in support of the argument that liability should still attach because the transaction between Kent and Ross amounted to a *de facto* merger. In *Knapp*, the predecessor corporation, Textile Machine Works, exchanged substantially all of its assets, including the rights to the trademark "Textile Machine Works," for stock in North American Rockwell, the acquiring corporation. North American also agreed to assume specified obligations and liabilities for which Textile Machine was not insured and to assume any liabilities for which Textile Machine had insurance if the insurance could be transferred to North American. Textile Machine was dissolved eighteen months after the bulk of its assets were sold for North American stock, pursuant to the agreement entered into by both parties. *Id.* at 363.

The Third Circuit reversed the trial court's entry of summary judgment in that case, holding that North American can be held liable as a successor corporation in the products liability case because the Rockwell-Textile Machine transaction was a *de facto* merger. The Court premised this decision on several factors. First, Textile Machine only existed as a corporate shell for eighteen months after the transaction. North American acquired all of the assets of Textile Machine except for some real estate which North American did not want. Secondly, the transfer of assets was in exchange for North American stock and North American assumed practically all of Textile Machine's liabilities. Next, the agreement required that Textile Machine use its "best efforts" to preserve the business intact by making available its officers and employees while maintaining its present customers and suppliers. Finally, North American could easily have protected itself by accepting an assignment of Textile Machine's prepaid liability insurance.

The *Knapp* decision is readily distinguishable, however, from the facts of this case. Obviously, the Court's holding was affected by the exchange of stock and the continuity of the business. In this case, Ross only purchased the assets for $18,704.00. No stock was exchanged between Ross and Kent. The Court notes that transfer of stock is a key element for finding a *de facto* merger because it represents a continuity of shareholder ownership and interest. *See Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 440 & n.5 (7th Cir. 1977); *Jacobs v. Lakewood Aircraft Service, Inc.*, 512 F.Supp. 176, 181 (E.D.Pa.1981). Secondly, Ross only used the "Kent Machine Works" trademark in renaming its own "GPE mill." The "Kent" trademark was acquired in order to protect against potential adverse competition by other manufacturers who might have acquired the rights to this name. Deposition of Richard Ross, at 34, 47; Deposition of Jerome Medowar, at 109–110. Thirdly, Ross never continued the Kent Machine three roll ink mill line because the acquired blueprints and drawings were of no use to Ross. Deposition of Richard Ross, at 18, 28, 66. Finally, the record does not even suggest that Ross in any way instigated Kent's decision to dissolve in order to take over Kent's business. To the contrary, it seems plain that Kent's decision to dissolve was its own, and Ross merely purchased a few of Kent's assets once they became available. *See* Affidavit of William P. Tucker.

### (3) *Continuity*

Continuity of a business in the form of a successor corporation will be found if there is a common identity of stock, directors, stockholders, and employees after the transfer from the selling corporation to the acquiring corporation. *Travis v. Harris Corp.*, 565 F.2d 443, 447 (7th Cir. 1977); *Jacobs v. Lakewood Aircraft Service, Inc.*, 512 F.Supp. 176, 181 (E.D.Pa. 1981). The continuity exception is very limited. The exception turns on the continuity of the corporate entity, not the continuity of the business operation. *Travis v. Harris Corp.*, 565 F.2d at 447. In the present case,

the transaction was based on a sale of assets for cash; again, no shares of stock were exchanged. Moreover, not a single Kent employee was hired by Ross after Kent Machine Works, Inc. dissolved. Mr. DeSena, the Secretary of Kent, was not hired by Ross. Deposition of Richard Ross, at 70–71.

Plaintiff cites *Cyr v. B. Offen & Co.*, 501 F.2d 1145 (1st Cir. 1974) in support of successor liability. In *Cyr*, the First Circuit held that B. Offen & Co., the acquiring corporation, was liable for the torts of its predecessor corporation because the key employees of the predecessor continued to run the same business after the owner died. These employees eventually purchased the business from the decedent's estate. Furthermore, existing contract and service obligations were carried forward by the purchasers—the former employees. Thus, the Court held that B. Offen & Co. was potentially liable because of the continuation of the old business. *Cyr* is distinguishable from our case. Ross, admittedly, wanted to acquire new business when it purchased the past files of Kent and hoped that it could supply new parts for old Kent machines and sell new equipment to old Kent customers based on information contained in the records. Deposition of Richard Ross, at 27. However, no existing contractual obligations were assumed by Ross after the purchase of the Kent assets. Deposition of Richard Ross, at 21; Deposition of Jerome Medowar, at 122.

Similarly, *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976) is also distinguishable from the present case. In *Turner*, the successor corporation purchased all of the assets of the selling corporation for $6,380,000.00, assumed existing liabilities, and continued the same policies and operations while maintaining the same properties and personnel. *Id.* at 883–84. None of these factors are present here. Ross did not manufacture the same line of Kent three roll ink mill because Ross only applied the Kent trademark to its own "GPE mill." Ross used its own manufacturing plant, blueprints and employees.

For these reasons, the Court holds that there is no genuine issue of material fact that Ross is a continuation of Kent.[6]

### B.  Product Line Exception

Plaintiff finally asserts that Ross is equitably estopped from representing that it is not, in fact, Kent Machine Works, Inc., and that it should be held liable based on "enterprise liability." In raising these arguments, plaintiff essentially urges the Court to adopt the newly developed "product line exception."

In *Ray v. Alad Corporation*, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977), the California Supreme Court carved out a new exception for successor corporation liability in products liability actions by departing from the traditional exceptions based on rigid corporate law notions of merger, consolidation, and assumption of liabilities, in favor of a new exception based on the policies underlying strict tort liability and the notion that costs of injuries resulting from defective products should be borne by the manufacturers who benefit from putting these products in the market. Based on this new principle, the Court held that a successor corporation, not liable under the traditional corporate exceptions, may still be found liable for its predecessor's defective products after purchasing the predecessor's assets under the following three part test:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading rule, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Id.* at 580, 560 P.2d at 9.

The purpose for the "product line" exception is to spread the costs of injuries result-ing from the manufacture of defective products to corporations acquiring the assets of the previous manufacturer where it would be fair and just because the acquiring corporation continues substantially the same business and same manufacturing operation. *Id.* at 579–580, 560 P.2d at 8–9.

Applying this test to the facts of the case, the California Supreme Court found that the plaintiff did not have a remedy against the original manufacturer because the original manufacturer had dissolved the corporation and plaintiff had been injured after falling from a defective ladder manufactured by Alad I. Applying the second prong, the Court found that the successor corporation, Alad II, having purchased all of the assets of the predecessor corporation for $207,000.00, including the plant, equipment, inventory, trade name and good will for manufacturing these ladders, in addition to maintaining the same employees and consulting services of the original general manager, remained in a position where it could reasonably estimate the risks of claims for injuries from past defective products by obtaining insurance coverage. *Id.* at 581, 560 P.2d at 10. For this reason and under the final prong of the test, the Court found that any imposition of liability would be "fair and equitable" because of the acquisition of the trade name and good will by the successor corporation, Alad II, and the essential continuation of the business as an ongoing enterprise under the same name. *Id.* at 581–82, 560 P.2d at 10–11.

The New Jersey Supreme Court has also adopted the product line exception. *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 431 A.2d 811 (1981). In *Ramirez*, the plaintiff was injured by a defective power press manufactured and sold to plaintiff's employer in the late 1940's. The manufacturer of the power press sold all of its assets to a third party, who, in 1956, transferred these assets to the defendant, Amstead Industries, for $1,200,406.00 in cash. The sale of these assets included the manufacturing

---

**6.**  Plaintiff did not assert that the fourth exception—a transaction fraudulently entered to es-cape liabilities—applies to the facts in this case.

plant, inventory, machinery, equipment, patents, existing contracts and the exclusive use of the name of the original manufacturer, "Johnson Machine and Press." As part of the consideration for the sale, defendant agreed to assume certain liabilities but disclaimed liability for defective products previously sold. The New Jersey Supreme Court affirmed the Appellate Division's reversal of the trial court's granting of summary judgment by holding:

> ... that where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Id.* at 825.[7]

█ In *Dawejko v. Jorgensen Steel Co.*, Pa.Super., 434 A.2d 106 (1981), the Pennsylvania Superior Court followed *Ramirez* and adopted the product line exception as the new rule in Pennsylvania.[8] In this case, plaintiff was injured by a lifting machine named the "Mansaver," which was manufactured and sold to plaintiff's employer in 1957. In 1964, the manufacturer, Mansaver Industries, sold its assets to defendant who then formed a subdivision named "Mansaver Industries, Inc." Defendant continued to manufacture the same product under the "Mansaver" name. Adopting the product line test as formulated in *Ramirez*,[9] the Court also added that the following factors will always be pertinent:

> ... whether the successor corporation advertised itself as an ongoing enterprise, *Cyr v. B. Offen & Co.*, [501 F.2d 1145 (1st Cir. 1974)]; or whether it maintained the same product, name, personnel, property, and clients, *Turner v. Bituminous Casualty Co.*, [397 Mich. 406, 244 N.W.2d 873 (1976)]; or whether it acquired the predecessor corporation's name and good will, and required the predecessor to dissolve, *Knapp v. North American Rockwell Corp.*, [506 F.2d 361 (3d Cir. 1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975)]. Also, it will always be useful to consider whether the three-part test stated in *Ray v. Alad Corp.*, [19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977)], has been met.

*Dawejko v. Jorgensen Steel Co.*, 434 A.2d at 111. Applying this rule to the facts of the case, the Court concluded and held that the trial court did not err in refusing to grant defendant's motion for a judgment n. o. v. because defendant had continued to operate the business by manufacturing and selling

---

7. Reasoning that "there was a reasonable basis for reliance by successor corporations and their insurance carriers on the general rule of nonliability" under past decisions in the "acquisition-of-assets-for-cash context," the Court limited the application of the new product line theory to the present defendants and plaintiffs with products liability suits against successor manufacturers, which suits were in progress as of November 15, 1979, the date that the product line exception was first announced by the Appellate Division. *Id.* at 824.

8. The Pennsylvania Supreme Court, as yet, has not ruled on this issue. Although state intermediate appellate decisions are not automatically controlling in a diversity case, they must be attributed some weight in predicting state law where the highest court of the state has not yet ruled on the issue. *National Surety Corp. v. Midland Bank*, 551 F.2d 21, 29 (3d Cir. 1977). For purposes of the present motion, the Court will assume *arguendo* that the extension of this new rule of successor liability would govern in

this case. *See also Jacobs v. Lakewood Aircraft Service, Inc.*, 512 F.Supp. 176, 182 (E.D. Pa.1981). New York has not as yet addressed this issue, but the Court assumes, for the purposes of the present motion, that the product line exception would apply in New York as well.

9. The rule is stated as follows:

> [W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Dawejko v. Jorgensen Steel Co.*, 434 A.2d at 110 (quoting *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 338, 431 A.2d 811, 825 (1981)).

the "Mansaver" product after acquiring the assets, including Mansaver's trademark and good will and continuing the business under this same name. *Id.* at 16–18.

In *Jacobs v. Lakewood Aircraft Service, Inc.,* 512 F.Supp. 176 (E.D.Pa.1981), Chief Judge Lord addressed this product line question and granted defendant's motion for summary judgment. Applying the test to the facts of the case, the Court held that defendant, Flight Extenders, Inc. (California), could not be held liable for a defective airplane wing tip tank fuel system manufactured by its predecessor, Flight Extenders, Inc. (Connecticut). Although decided before the *Dawejko* ruling, the Court assumed *arguendo* that Pennsylvania would adopt the "product line" exception for purposes of that case. Flight Extenders, Inc. (California) had purchased the assets of Flight Extenders, Inc. (Connecticut) for $18,000.00. These assets included tools, molds, design drawings, parts, raw materials, placards, manuals, documents, and the name "Flight Extenders" and the good will attached to the name. After acquiring these assets, Flight Extenders, Inc. (California) set up a new manufacturing facility and purchased additional equipment for the manufacture of the fuel tank system. None of the employees, officers or directors of the old corporation were either hired by or involved with the new corporation. *Id.* 512 F.Supp. at 178–79. Noting the general rule that a company purchasing the assets of another can not be held liable for the debts or liabilities of the selling corporation merely by virtue of its succession to the transferor's property, Chief Judge Lord held that the presented facts did not result in liability under the traditional exceptions for corporate successor liability nor under the product line exception. *Id.* at 185. The Court notes that the *Jacobs* case is similar in many respects to our present case and that its reasoning is both persuasive and sound. *See also Tucker v. Paxson Machine Co.,* 645 F.2d 620 (8th Cir. 1981) (finding no liability under similar facts).

■ With these principles in mind, we now turn to the facts of the present case

viewed in the light most favorable to plaintiff. Viewing the facts as such, the Court holds as a matter of law that there are no genuine issues of material fact which may lead to the conclusion that Ross can be held liable under the product line test for the defects of equipment previously manufactured by Kent. First, the record clearly shows that Ross did not acquire "all or substantially all the manufacturing assets" of Kent. Ross acquired the rights to the trade name "Kent Machine Works," a gear cutter, old blueprints and files, and a small assortment of miscellaneous machine parts. Deposition of Richard Ross, at 17–19. Ross did not acquire the manufacturing plant nor the equipment used to manufacture three roll ink mills. Affidavit of William P. Tucker, Esquire. The blueprints for the old Kent three roll ink mills were never used by Ross. Deposition of Richard Ross, at 18, 28, 66. No existing accounts receivable or contractual obligations were transferred to Ross. Deposition of Jerome Medowar, at 105, 122. Moreover, Ross did not hire old Kent employees to continue this product line. Deposition of Richard Ross, at 70–71.

Secondly, it is clear that Ross did not undertake "the same manufacturing operation" as Kent. Ross sold its own brand of three roll ink mills, the "GPE mill," which was manufactured by an independent contractor, Roy Allen, and marketed by Ross. Ross did not manufacture the Kent three roll ink mill because the acquired drawings and blueprints could not be used by Ross. Deposition of Richard Ross, at 18, 28, 66. Rather, Ross renamed the "GPE mill" as the "Kent mill" since it had acquired the "Kent" trade name rights. Deposition of Richard Ross, at 50–52, 61. The mere use of Kent's trademark and good will cannot be said to raise a factual issue that Ross engaged in "essentially the same manufacturing operation" as Kent. Bearing upon the Court's decision, the Standard & Poor's listing of Kent Machine Works, Inc., as a subsidiary of Ross Company and the identical telephone listings for both Kent Machine Works, Inc. and Charles Ross & Son Co., Inc., does raise the question whether Ross advertised itself as an ongoing enter-

prise as Kent. Furthermore, Ross executives stated in their depositions that Ross engaged in the business of rebuilding Kent mills both before and after the sale.

Deposition of Richard Ross, at 44. Moreover, it is undisputed that Ross was hoping to acquire new business by purchasing Kent records—supplying new machinery parts to old Kent customers and selling new equipment to the same. Deposition of Richard Ross, at 27. All these items are factors which must be considered by the Court. Nevertheless, viewing all inferences which may be reasonably drawn in favor of plaintiff, it still cannot be said that the present evidence raises genuine issues of material fact that Ross maintained the same product, personnel, property, and clients by undertaking "essentially the same manufacturing operation."

Applying the three-pronged test announced in *Ray v. Alad*, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977), and adopted in *Dawejko v. Jorgensen Steel Co., supra*, as an additional factor to be considered in determining liability, the same conclusion is reached. Plaintiff does not have any remedies against the manufacturer because Kent Machine Works, Inc. dissolved in 1970 and no longer can be sued as a corporate entity. Under the second prong, however, it cannot be said that Ross maintains "the ability to assume the original manufacturer's risk-spreading rule," *id.* at 580, 560 P.2d at 9, since Ross acquired the trademark rights and old blueprints and records of Kent. Ross did not acquire either such "physical resources" as the physical plant, the manufacturing equipment, and the inventories of raw material, work in progress, and finished goods, or such "intangible resources" as the know-how available through the records of manufacturing designs, the continued employment of the factory personnel, and additional consulting services of the original manufacturer. *See Ray v. Alad*, 136 Cal.Rptr. at 581, 560 P.2d at 10. Thus, Ross did not have the same capacity as Kent to "estimate the risks of claims for injuries from defects in previously manufactured [products] for purposes of obtaining insurance coverage or planning self-insurance." *Id.* at 581, 560 P.2d at 10. Ross cannot be charged, as a matter of law, with this knowledge on the basis of the limited amount of assets acquired from Kent. Additionally, the imposition of liability on Ross would not be "fair and equitable" as a matter of law in view of the limited acquisition of Kent assets, which consisted primarily of the "Kent" trademark and any good will which would flow from the use of the trade name. Ross only used the trademark in renaming its own "GPE" three roll ink mill. For these reasons and others herein expressed, imposition of liability would not be "fair and equitable" in this case.

III. *Conclusion*

After examining all these factors and applying the traditional exceptions and the product line test, *see Dawejko v. Jorgensen Steel Co.*, Pa.Super., 434 A.2d 106 (1981), the Court holds, as a matter of law, that there are no genuine issues of material fact under which Ross can be held liable for a defective product manufactured by Kent. We emphasize that courts must be especially careful in applying the new product line test in cases where defendant corporations only purchase limited assets for cash. The general rule is that "when one company sells or transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor simply by virtue of its succession to the transferor's property." *Husak v. Berkel, Incorporated*, 234 Pa.Super.Ct. 452, 456–57, 341 A.2d 174, 176 (1975). The product line exception provides only a limited exception to this general rule in order that plaintiffs may recover in cases where the rigid rules of traditional corporate exceptions would otherwise prevent recovery. Liability for the wrongs of the selling corporation cannot be imposed on the purchasing corporation merely because the latter corporation purchases some assets which thus allows the purchasing corporation to market its own products under the newly acquired trademark names. In contrast, the limited purpose of this exception is to hold asset-purchasing corporations liable for defective products of the asset-seller when the pur-

722

chasing corporation acquires "all or substantially all the manufacturing assets . . . and undertakes essentially the same manufacturing operation as the selling corporation." *Dawejko v. Jorgensen Steel Co.*, Pa. Super., 434 A.2d 106, 110 (1981) (quoting *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 431 A.2d 811, 825 (1981)). Therefore, for these reasons, the defendant is entitled to summary judgment and judgment will be entered against plaintiff and in favor of defendant.

An appropriate Order will be entered.