Keith E. WHITMORE

v.

BOBST GROUP, INC. and American Bobst Holding, Inc.

Civ. A. No. 86–0207.

United States District Court, E.D. Pennsylvania.

July 28, 1987.

Thomas Malcolm, West Chester, Pa., for plaintiff.

Robert G. Kelly, Jr., Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court are defendants' motions to alter or amend judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, for judgment notwithstanding the verdict pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, for a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, to stay execution of or on any proceeding to enforce the judgment pursuant to Rule 62(b) of the Federal Rules of Civil Procedure, and plaintiff's petition for delay damages pursuant to Pennsylvania Rule of Civil Procedure 238. For the reasons stated herein, all of defendants' motions and plaintiff's petition will be denied.

## I. BACKGROUND

Plaintiff, Keith Whitmore, injured his right hand on August 14, 1984, in an industrial accident. At the time of the accident he was employed by the Denney-Reyburn Company in West Chester, Pennsylvania, as a printing press machine ("press" or "press machine") operator. The press, a New Era 12 × 12, produces printed tags, stickers, labels and similar packaging items which are formed to a specified size in what is known as the toggle head area of the press. At the time of the accident plaintiff was attempting to clear a paper jam at the toggle head area and a die descended upon three fingers of his hand inflicting crush-type injuries.

Plaintiff had been operating this particular press for approximately one year before his injury in 1984. The press could be started and stopped using either on/off buttons on the press or with levers assembled on the operator's side of the press, along a common shaft that runs parallel to the length (40 to 45 feet) of the press. The levers were brake levers which were used to bring the moving parts of the press to a halt without turning off the power to the press. When the clutch was disengaged by means of one of these levers bringing the operations of the press to a halt, the press continued to be energized (the power was still on). Thus, when plaintiff stopped the press by means of the lever and reached into the toggle head area, the press was still operational. As the plaintiff reached into the unguarded toggle head area, the press suddenly started up. No explanation has been established as to why this happened. Plaintiff was unable to withdraw his hand fast enough to avoid injury.

At trial, plaintiff contended that the press machine was defective in that it lacked features essential to its safe use. Specifically, plaintiff contended and offered evidence: (1) that the toggle head area, where the die exerted a pressure of between 10,000 and 20,000 pounds, should have been guarded; (2) that the press should have been equipped with a device or devices that emitted audible and/or visual warnings that the still press machine was about to become operational; and (3) that there should have been printed warnings in the area of the toggle head advising of the danger of putting a hand into that area while the press' power was still on.

The press which injured plaintiff's hand had been manufactured, sold and delivered to plaintiff's employer in 1945 by the New Era Manufacturing Company ("New Era"). Two former officers of New Era formed Powers & Eaton Industries, Inc. ("Powers & Eaton") and in February, 1965, New Era became a division of Powers & Eaton and New Era ceased to exist. *See* P–71(A) and (B). On June 30, 1969, Powers & Eaton changed its name to Star-New Era, Inc. ("Star-New Era"). *See* P–108(A) through (C). On May 19, 1971, Star-New Era sold its assets involved in the manufacture, sale and maintenance of its press machine lines to Bobst-Champlain, Inc. ("Bobst-Champlain"). *See* P–94(A) through (I). A few years later on June 27, 1974, Star-New Era dissolved and ceased to exist. *See* P–72(A) and (B). From May or June, 1971 through July, 1978, Bobst-Champlain continued to manufacture and sell this line of $12 \times 12$ presses. The predecessor companies of Bobst-Champlain have continued to service New Era presses and to sell parts to present owners of New Era presses. Plaintiff introduced into evidence pages from two different 1986 New Jersey Bell Telephone Directories which contain listings for the "New Era Products Department of Bobst-Champlain." *See* P–119 and P–120. On December 29, 1982, Bobst-Champlain merged into defendant American Bobst Holding, Inc. ("American Bobst") with a complete transfer of all assets and a dissolution of Bobst-Champlain. *See* P–124(A) through (I). Defendant Bobst Group, Inc. ("Bobst Group") is a part of American Bobst.

This case was tried before a jury from October 21 to October 24, 1986. The case was submitted to the jury by way of special interrogatories for its verdict. The jury answered those interrogatories and rendered a verdict in plaintiff's favor on October 24, 1986, by finding that the press machine was defective because it did not have a guard; because it did not have visible or audible warnings that would warn an operator that it was about to start up from a stopped position and because it did not have a printed warning to the operator to keep his or her hands out of the toggle head area. The jury also found that at least one of these defective conditions was the proximate cause of plaintiff's injuries; that the plaintiff did not assume the risk of injuries to his hand; and, that plaintiff was entitled to recover damages in the amount of $100,000.00. Judgment was entered on these verdicts on October 28, 1986, and it is from this judgment that defendants seek relief by means of the post-trial motions now before the court.

At the close of plaintiff's case-in-chief and at the close of all of the evidence, the defendants made a timely motion for a directed verdict on the issue of successor liability. With respect to the issue of the "product line" exception to the general rule of corporate successor non-liability, the court denied defendants' motion for directed verdict. The court, applying the product line exception as Pennsylvania law, ruled that plaintiff had made out his *prima facie* case that Bobst Group and American Bobst were successors in liability to Star-New Era and that Star-New Era in turn was the successor in liability to New Era, the manufacturer of the machine. At the close of the evidence, there being no dispute as to the various entities and their role in the chain of existence, the court concluded that there was no genuine issue as to those facts and that plaintiff was entitled to a ruling, as a matter of law, that successor liability was established.

Defendants contend that this court erred in: (1) granting plaintiff's motion for a directed verdict on the issue of the product line theory of liability; and (2) denying defendants' motion for a directed verdict on that issue. Defendants ask the court to: (1) grant their motion for judgment notwithstanding the verdict; (2) vacate and set aside the judgment on the verdict; and, (3) enter judgment in favor of defendants. Defendants ask in the alternative that the court set aside the jury verdict and grant defendants a new trial on the issues of defect, substantial change and assumption of risk. Defendants raise numerous issues and arguments in their over 130 pages of post-trial motions and supporting memoranda. Since the arguments contained in

defendants' memoranda are so numerous and the court addressed many or all of them at trial, the court will not discuss each of them here. The court, however, believes a discussion of its ruling on the issue of the "product line" theory of liability is appropriate.

## II. DISCUSSION

### A. *Standard For Judgment N.O.V.*

The standard for granting a motion for judgment n.o.v. is the same as that for a directed verdict. *E.J. Stewart, Inc. v. Aitken Products, Inc.*, 607 F.Supp. 883, 888 (E.D.Pa.1985); *Neville Chemical Company v. Union Carbide Corp.*, 422 F.2d 1205, 1210 n. 5 (3d Cir.1970), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). The jury's verdict will be set aside only if manifest injustice will result if such verdict is allowed to stand. To grant such a motion the court must find as a matter of law that there can be but one reasonable conclusion as to the proper judgment. *Woodward & Dickerson, Inc. v. Yoo Hoo Beverage Co.*, 502 F.Supp. 395, 397 (E.D.Pa. 1980), *aff'd mem.*, 661 F.2d 916 (3d Cir. 1981). In ruling on defendants' motion the court should view the evidence, and all inferences therefrom, in a light most favorable to plaintiff. *Thomas v. E. J. Korvette Inc.*, 476 F.2d 471 (3d Cir.1973).

### B. *Corporate Successor Liability*

Under Pennsylvania law[1] the general rule as to corporate successor liability is that:

> ... when one company sells or transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor simply by virtue of its succession to the transferor's property. In order to find that this general rule is not applicable and that the transferee does acquire such liability, one of the following must be shown: (1) the purchaser expressly or impliedly agrees to assume such obligation; (2) the

transaction amounts to a consolidation or merger; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is fraudulently entered into to escape liability. *Husak v. Berkel, Inc.*, 234 Pa.Super. 452, 456–57, 341 A.2d 174, 176 (1975). *See also, Polius v. Clark Equip. Co.*, 802 F.2d 75 (3d Cir.1986), *reh'g and reh'g en banc denied*, (October 23, 1986); *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 308–09 (3d Cir.1985); *Knapp v. North American Rockwell Corp.*, 506 F.2d 361, 363–64 (3d Cir.1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975); *Jacobs v. Lakewood Aircraft Serv., Inc.*, 512 F.Supp. 176, 179 (E.D.Pa.1981); *Savini v. Kent Mach. Works, Inc.*, 525 F.Supp. 711 (E.D. Pa.1981); *Woody v. Combustion Eng'g, Inc.*, 463 F.Supp. 817, 819 (E.D.Tenn.1978) (applying Pennsylvania law).

Plaintiff does not assert that any of these four traditional exceptions to the general rule of the non-liability of a successor corporation apply to the instant facts. Instead plaintiff asserted that the policies underlying strict tort liability for defective products compel a fifth exception to the general rule: the product line exception or product line theory. This court must examine whether Pennsylvania law recognizes the product line exception.

### C. *Predicting State Law Re: Product Line Exception*

In ascertaining state law in federal diversity cases, the court must look to the state's highest court. *Connecticut Mut. Life Ins. Co. v. Wyman*, 718 F.2d 63, 65 (3d Cir.1983). Since the Pennsylvania Supreme Court has yet to decide this important issue, this court once again finds itself in the difficult position of having to predict Pennsylvania law.[2]

In predicting the law in Pennsylvania with respect to the product line theory issue in the present case, the court looked to various sources. First, the court con-

---

1. The parties acknowledge that the substantive law of Pennsylvania controls in this case.

2. This court found itself in this position and discussed this very issue almost 6 years ago. *Savini v. Kent Mach. Works, Inc., supra*, 525 F.Supp. at 719 n. 8.

sidered a Pennsylvania intermediate appellate state court decision, *Dawejko v. Jorgensen Steel Co.,* 290 Pa.Super. 15, 434 A.2d 106 (1981), which decided the product line theory issue. Second, the court considered two United States Third Circuit Court of Appeals' decisions, *Polius v. Clark Equip. Co., supra;* and *Knapp v. North American Rockwell Corp., supra,* which discussed the product line theory and/or Pennsylvania's public policy on strict liability. Third, the court looked to the New Jersey Supreme Court's decision, *Ramirez v. Amsted Indus., Inc.,* 86 N.J. 332, 431 A.2d 811 (1981), which adopted the product line exception. Fourth, the court considered two earlier decisions by other members of this court, which treated the product line exception as adopted in *Dawejko* as the law of Pennsylvania. *Amader v. Pittsburgh Corning Corp.,* 546 F.Supp. 1033 (E.D.Pa.1982); *McClinton v. Rockford Punch Press and Mfg. Co., Inc.,* 549 F.Supp. 835 (E.D.Pa.1982).

### 1. *Pennsylvania Superior Court Decision: Dawejko*

■ First, the court considered *Dawejko v. Jorgensen Steel Co.,* 290 Pa.Super. 15, 434 A.2d 106 (1981), an intermediate appellate state court decision which specifically adopted the "product line" exception. The *Dawejko* court adopted the product line rule as formulated in *Ramirez, supra,* 86 N.J. at 338, 431 A.2d at 825. The rule is stated as follows:

> [W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Dawejko, supra,* 290 Pa.Super. at 23–26, 434 A.2d at 110–11 (*quoting Ramirez, supra*).

The *Dawejko* court also added that the following factors will always be pertinent:

... whether the successor corporation advertised itself as an ongoing enterprise, *Cyr v. B. Offen & Co.,* [501 F.2d 1145 (1st Cir.1974)]; or whether it maintained the same product, name, personnel, property, and clients, *Turner v. Bituminous Casualty Co.,* [397 Mich. 406, 244 N.W.2d 873 (1976)]; or whether it acquired the predecessor corporation's name and good will, and required the predecessor to dissolve, *Knapp v. North American Rockwell Corp.,* [506 F.2d 361 (3d Cir.1974), *cert. denied,* 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975)]. Also, it will always be useful to consider whether the three-part test stated in *Ray v. Alad Corp.,* [19 Cal.3d 22, 136 Cal. Rptr. 574, 560 P.2d 3 (1977)], has been met.

*Dawejko, supra,* 434 A.2d at 111. The three-part test of *Ray v. Alad Corp., supra,* which the *Dawejko* court stated would be a pertinent factor, is as follows:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading rule, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Ray, supra,* 19 Cal.3d at 31, 560 P.2d at 8–9, 136 Cal.Rptr. at 579–80.

The facts in *Dawejko* are illustrative. Plaintiff was injured by a lifting machine named the "Mansaver," which was manufactured and sold to plaintiff's employer in 1957. In 1964, the manufacturer, Mansaver Industries, sold its assets to defendant who then formed a subdivision named "Mansaver Industries, Inc." Defendant continued to manufacture the same product under the "Mansaver" name.

In applying the rule it announced to the facts of the case, the *Dawejko* court concluded that defendant had continued to operate the business by manufacturing and

selling the "Mansaver" product after acquiring the assets, including Mansaver's trademark, good will and continuing the business under the same name. *Dawejko, supra,* at 116–118. Accordingly, the *Dawejko* court held that the trial court did not err in refusing to grant defendant's motion for a judgment n.o.v.

Although *Dawejko,* a decision of a "lower state court," is not controlling, it:

... is a datum for ascertaining state law which is not to be disregarded by a federal court *unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.*

*Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *see also, National Surety Corp. v. Midland Bank,* 551 F.2d 21, 29 (3d Cir.1977). In the absence of persuasive data to the contrary, the court presumes that the determination of the superior court in *Dawejko* is the law of Pennsylvania. *See Discussion* section C(4), *infra.*

The court in *Dawejko* held that it is the public policy in Pennsylvania in cases where defective products have resulted in harm to the users of those products to place the burden for that harm on the manufacturers/suppliers of the products on the theory that they are in the best position to bear the harm since they can pass the cost of it along to the purchasers of these products. The *Dawejko* court further reasoned that the product line exception was a natural extension of this policy.

The product line exception is consistent with and constitutes a furthering of the Pennsylvania law of strict product liability. The essence of that exception is that a corporation which has acquired a product line from another and has continued to manufacture the products of that line, utilizing as it does so the good will acquired with the acquisition of the line, has the means to spread the risk of harm caused by defective products in the line. Therefore, where the original company, subsequent to selling the product line, has gone out of business with the result that a party injured by reason of a defective product

manufactured by it cannot look to the original manufacturer for the satisfaction of his or her loss, the injured party can look to the successor for remedy. Again, this concept has nothing to do with fault. It is premised on the idea that the party that has chosen to continue the product line is in a better position to bear the cost resulting from a defect of a product of that line because it can pass it along to the consuming public.

### 2. *Third Circuit Court of Appeals Decisions: Polius and Knapp*

Second, in determining whether the product line exception is part of Pennsylvania law, this court considered two U.S. Third Circuit Court of Appeals' decisions: *Polius v. Clark Equip. Co., supra;* and *Knapp v. North American Rockwell Corp., supra.* Defendants, relying in part on *Polius,* argue that this court erred at trial in predicting that the Pennsylvania Supreme Court would join those jurisdictions which have adopted the product line theory of liability.

In *Polius* the U.S. Third Circuit Court of Appeals had to decide the case as the Supreme Court of the Virgin Islands would. The court of appeals noted that where the Virgin Islands has no governing statute, reference must be made to the common law, first as expressed in the Restatements, and then as generally understood and applied in the United States. Since the Restatement was silent and thus did not control and a split of authority existed, the court of appeals had to select the law which it thought represented the better approach, be that the minority or majority rule. The court chose to follow the majority rule and thus determined that the law of the Virgin Islands would not adopt the product line theory of liability.

Unlike *Polius,* and like *Knapp v. North American Rockwell Corp., supra,* in this case the court is limited in its role as a diversity court to predicting the appropriate Pennsylvania law. In *Knapp* a defendant corporation ("Rockwell") contended that as a successor corporation it was entitled to summary judgment where it had not manufactured the defective product which

injured the plaintiff ("Knapp"). The *Knapp* court indicated that:

> ... the philosophy of the Pennsylvania courts [is that] questions of an injured party's right to seek recovery are to be resolved by an analysis of public policy considerations rather than a mere procrustean application of formalities ...

*Id.*, 506 F.2d at 369.

In its analysis of the relevant public policy considerations the *Knapp* court stated:

> In resolving where the burden of a loss should be imposed, the Pennsylvania Supreme Court has considered which of the two parties is better able to spread the loss.

*Id.* (referring to *Ayala v. Philadelphia Bd. of Educ.*, 453 Pa. 584, 305 A.2d 877 (1973)). Here, as in *Knapp*, neither the injured plaintiff nor the successor corporation was ever in a position to prevent the occurrence of the injury, inasmuch as neither manufactured the defective device. As between these two parties, however, the successor corporation is better able to spread the burden of the loss. *See Knapp, supra,* 506 F.Supp. at 369–70. The *Knapp* court therefore predicted that the Pennsylvania Supreme Court would be influenced by the social policy of spreading the risk for harm and that it would find that a successor corporation could be liable despite the fact that it had neither manufactured nor supplied the product in question. Accordingly, the *Knapp* court ruled that the corporate successor, Rockwell, was not entitled to a summary judgment stating:

> Rockwell therefore should not be permitted to impose the weight of the loss upon a user of an allegedly defective product by delaying the formal dissolution of TMW. *In the absence of contrary controlling decisions by the Pennsylvania courts, we conclude that the state judiciary would adopt the rule of law that appears to be better reasoned and more consistent with the social policy set forth in recent Pennsylvania cases.*

*Id.* at 370 (emphasis added).

### 3. *New Jersey Supreme Court Decision: Ramirez*

Third, the court looked to the decision of the highest state court of another district in this circuit, Pennsylvania's sister state, New Jersey, which adopted the product line exception to the principle of successor non-liability. *Ramirez v. Amsted Indus., Inc., supra.* Defendants in the instant action argue that there are fundamental differences in terms of strict products liability policy considerations between the laws of New Jersey and Pennsylvania. Under New Jersey law, as expressed by *Ramirez,* the threshold requirement that a defendant have control of or have distributed the defective product is set aside in deference to New Jersey's paramount concern of societal risk spreading. *Ramirez, supra,* 86 N.J. at 351, 431 A.2d at 821. Defendants contend that under Pennsylvania law, as expressed by *Nath v. National Equip. Leasing Corp.*, 497 Pa. 126, 439 A.2d 633 (1981), control and distribution of the defective product is the *sine qua non* of a viable action against a supplier or manufacturer in strict tort liability. Defendants further assert that in *Nath* the Pennsylvania Supreme Court made it clear that risk spreading is not the predominate policy consideration in Pennsylvania when it rejected subjecting a financial "lessor" to strict tort liability on the mere basis of its superior position to spread the costs of product injury over society at large. Rather, defendants' argument continues, the threshold consideration in Pennsylvania strict product liability law is whether the defendant had control over the manufacture or supply of the defective product. Thus defendants maintain, despite *Dawejko*, the product line liability theory must fail in Pennsylvania.

Defendants ask this court to disregard *Dawejko* because, *inter alia*, at the time *Dawejko* was decided, "the court did not have the benefit of the Pennsylvania Supreme Court's pronouncement in *Nath* limiting product liability to those who actually place a defective product in the stream of commerce." Defendants' Memorandum at page 27. The Pennsylvania Supreme Court's *Nath* decision came down some four months after *Dawejko* was decided. The defendants suggest that the court in *Dawejko* would have decided the case dif-

ferently if it had "the benefit" of the Pennsylvania Supreme Court's reasoning in *Nath*.[3] This suggestion overlooks the fact that the opinion of the superior court in *Nath* which the Pennsylvania Supreme Court later affirmed was authored by the very same judge, now retired Judge Edmund B. Spaeth, Jr., who wrote the opinion for the Pennsylvania Superior Court in *Dawejko*. Certainly, it must be assumed that Judge Spaeth, in writing the opinion in *Dawejko*, was fully aware of the opinion that he had written the previous year in *Nath*. The reasoning which prevented the extension of strict liability to lenders in the facts presented in *Nath* must not have been deemed applicable by Judge Spaeth to the question in *Dawejko*, as to whether the policy behind the strict liability law in Pennsylvania was such that the product line exception should be adopted.

In a 4-to-3 decision the Pennsylvania Supreme Court in *Nath* found that a lessor under a secured transaction financing device is not subject to an action in strict tort liability. In *Nath*, the plaintiff lost three fingers and part of his hand in an industrial accident when they were caught in the unguarded gears of a cable stripping machine. Plaintiff's employer purchased the machine from the manufacturer and then requested the defendant lender to finance the purchase. The defendant, in turn, borrowed money from a bank in order to provide funds for plaintiff's employer's purchase of the machine and obtained from the manufacturer a new invoice showing the defendant as owner of the machine. The defendant then prepared a lease schedule for the machine and a financing statement to be filed in accordance with the security interest provisions of the Uniform Commercial Code. The lease was assigned to the bank as security in case the defendant defaulted on the loan. The security statement showed the defendant as a secured party and the plaintiff's employer as the debtor.

The plaintiff brought an action in strict tort liability against the manufacturer of the machine and against the financial "lessor." The trial court held that the lease was merely a financing device and refused to extend liability under Section 402A of the Restatement (Second) of Torts to a party whose role in the acquisition of the machine by the plaintiff's employer was to extend its credit so that the employer was able to purchase the machine. This result was first affirmed by the superior court and then by the Pennsylvania Supreme Court ("Supreme Court").

The plaintiff argued that any parties who facilitate the placing of goods in commerce through, for example, providing funds for purchase of the same, and who are in a superior position to spread the costs of injuries caused by those goods, should be subject to liability under Section 402A. *See Nath, supra,* 497 Pa. at 131–32, 439 A.2d at 636, and 497 Pa. at 133–34, 439 A.2d at 637 (Larsen, J., dissenting). Both the lower courts and the Supreme Court in *Nath* rejected the plaintiff's argument.

The Supreme Court in *Nath* noted that the issue upon which the case turned was whether Section 402A applies to a "lessor" under a secured transaction financing device. *Nath, supra,* 497 Pa. at 129, 439 A.2d at 634–35. The question was whether the "lessor" in fact supplied the particular chattel or whether he just offered the use of money. The court then found that the lessor did not *supply* the product that injured the plaintiff; but instead, its product was "collateral" and that the doctrine of strict liability under Section 402A did not extend to it.

The Supreme Court in *Nath* reasoned that it was clear from *Francioni v. Gibsonia Truck Corp.,* 472 Pa. 362, 372 A.2d 736 (1977) that there was no intention of extending the coverage of Section 402A to transactions that are designed solely for financing purposes. The court stated:

---

**3.** More recent decisions of the Pennsylvania Superior Court have had "the benefit" of the Pennsylvania Supreme Court in *Nath* and have ratified the *Dawejko* holding on the product line exception. *Burnside v. Abbott Laboratories, Inc.,* 351 Pa.Super. 264, 505 A.2d 973 (1985); *Martin v. Johns-Manville Corp.,* 322 Pa.Super. 348, 469 A.2d 655 (1984).

It would be novel indeed to suggest that financing agencies should be responsible for detecting defects in the products financed. Such a result would have catastrophic impact upon commerce.

*Nath, supra,* 497 Pa. at 132, 439 A.2d at 636.

This court notes the distinction drawn by the Supreme Court in *Nath* between financing agencies and institutions on the one hand and manufacturers and suppliers on the other hand. The reasons for not extending liability to financing agencies and institutions are not applicable to successor corporations. Thus, defendants' wholehearted reliance on *Nath* is misplaced since financing agencies and institutions are not comparable to manufacturers, suppliers and their successors when it comes to strict products liability.

### 4. *U.S. District Court for the Eastern District of Pennsylvania Decisions*

Fourth, in predicting the law in Pennsylvania with respect to the product line exception, the court considered two earlier decisions of United States District Court for the Eastern District of Pennsylvania. *Amader v. Pittsburgh Corning Corp.,* 546 F.Supp. 1033 (E.D.Pa.1982); *McClinton v. Rockford Punch Press and Mfg. Co., Inc.,* 549 F.Supp. 835 (E.D.Pa.1982). Both of those decisions treated the product line exception as adopted in *Dawejko* as the law of Pennsylvania. *Amader, supra,* 546 F.Supp. at 1036; *McClinton, supra,* 549 F.Supp. at 837 n. 1. *See also, Shorb v. Airco, Inc.,* 644 F.Supp. 923 (E.D.Pa.1986) (presuming that *Dawejko* is Pennsylvania law); *Savini v. Kent Mach. Works, Inc., supra,* 525 F.Supp. at 719 n. 8 (assuming *arguendo* that *Dawejko* is Pennsylvania law); *Jacobs v. Lakewood Aircraft Serv., Inc., supra,* 512 F.Supp. at 182–183 n. 4 (same).

### D. *Application Of The Product Line Theory*

Having concluded that Pennsylvania law embraces the product line theory of liability, the court next must apply it to the instant case. Plaintiff has established that defendants: (1) acquired the product line of the original manufacturer (New Era) of the defective product; (2) continued the product line; and (3) obtained and utilized the good will that accompanied the product line. The jury found by its verdict that plaintiff was injured by a defective product of that product line. Plaintiff also showed that the status of the original manufacturer of the product is such that the plaintiff cannot realize a remedy for the injury he has sustained from that entity.

For all of these reasons, it is this court's belief that if this case was before the Pennsylvania Supreme Court it would conclude that the defendants' motion on the question of successor liability should be denied. This court, therefore, must conclude likewise, and by appropriate Order so rule.

An appropriate Order will be entered.

### ORDER

AND NOW, TO WIT, this 28th day of July, 1987, in accordance with the accompanying Memorandum, after full consideration of defendants' motions to alter or amend judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, for judgment notwithstanding the verdict pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, for a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, to stay execution of or on any proceeding to enforce the judgment pursuant to Rule 62(b) of the Federal Rules of Civil Procedure, and plaintiff's petition for delay damages pursuant to Pennsylvania Rule of Civil Procedure 238, and the answers thereto, as well as the briefs and memoranda in support and in opposition, IT IS ORDERED as follows:

1. Defendants' motion to alter or amend judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure is hereby *denied;*

2. Defendants' motion for judgment notwithstanding the verdict pursuant to Rule 50(b) of the Federal Rules of Civil Procedure is hereby *denied;*

3. Defendants' motion for a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure is hereby *denied;*

4. Defendants' motion to stay execution of or on any proceeding to enforce the judgment pursuant to Rule 62(b) of the Federal Rules of Civil Procedure is hereby *dismissed* as moot; and

5. Plaintiff's petition for delay damages pursuant to Pennsylvania Rule of Civil Procedure 238 is hereby *denied.*